THE HONORABLE ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JULI ADAMS,                                    )
                                               )
Plaintiff,                                     )       Case No. 2:14-cv-1174 RSL
                                               )
        v.                                     )
                                               )       **DEFENDANT'S MOTION FOR**
                                               )       **SUMMARY JUDGMENT**
THE HARTZ MOUNTAIN                             )
CORPORATION,                                   )
                                               )       **NOTE ON MOTION CALENDAR:**
                                               )       **OCTOBER 30, 2015**
Defendant.                                     )
_____        )

128607.0001/6308929.1

**DEFENDANT'S MOTION FOR SUMMARY**
**JUDGMENT**

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

## <u>TABLE OF CONTENTS</u>

**Page**

I.    PRELIMINARY STATEMENT.......................................................................................1

II.   FACTUAL BACKGROUND.........................................................................................2

    A.   The Adams/Hartz Agreement................................................................................2

    B.   The Poor Sales of Hartz Products Using Plaintiff's Images. ................................4

    C.   Hartz's Agreement with Rovio to License the Popular Angry
         Birds Video Game Characters..............................................................................4

III.  LEGAL AUTHORITY.................................................................................................5

    A.   No Evidence In The Record Supports Plaintiff's Ownership of
         the ANGRY BIRDS Trademark or Her License of the Trademark
         To Hartz ................................................................................................................5

         i.    Plaintiff Owned No Rights in the Mark At The Time of
             The Agreement................................................................................................6

         ii.   The ANGRY BIRDS Mark Was Not Licensed by the
             Agreement .......................................................................................................6

         iii.  The Evidence Does Not Support Plaintiff's Contractual
             Interpretation..................................................................................................9

             1     Testimony Of The Agreement's Primary Drafter
                 Supports Hartz's Interpretation ...............................................................9

             2     No Testimony Supports Plaintiff's Interpretation ......................................11

             3     No Documents Support Plaintiff's Interpretation ......................................11

             4     The Parties' Conduct Supports Hartz's Interpretation...............................12

    B.   Adams Abandoned Any Rights in the ANGRY BIRDS Mark ..........................14

         i.    Adams Abandoned Any Trademark Rights Due to Non-Use ...............14

         ii.   Adams Abandoned Any Rights Via a Naked License ..........................16

    C.   Plaintiff's Unjust Enrichment Claims Fail as a Matter of Law..........................19

    D.   Plaintiff Cannot Recover Hartz's Profits as a Matter of Law ...........................19

         i.    Plaintiff Cannot Demonstrate That Hartz Willfully Intended
             to Create Consumer Confusion............................................................19

          ii.   Plaintiff has Made No Attempt to Demonstrate That Hartz's
             Sales Were Attributable to Plaintiff's Alleged Trademark ...................22

IV.   CONCLUSION...........................................................................................................23

128607.0001/6308929.1

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000  FAX: 206.223.7107

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Active Sports Lifestyle USA, LLC v. Old Navy, LLC,*
   No. SACV 12-572 JVS, 2014 WL 1246497 (C.D. Cal. Mar. 21, 2014)..............................22

*Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.,*
   289 F.3d 589 (9th Cir. 2002) ................................................................................. 16, 18

*Capital Ventures International v. Network Commerce, Inc.,*
   No. C02-0682L, 2006 WL 681033 (W.D. Wash. Mar. 16, 2006) (Lasnik, J.) ......................7

*Carl Zeiss Stiftung v. VEB Carl Zeiss Jena,*
   433 F.2d 707 (2d Cir. 1970) ..........................................................................................20

*Celotex Corp. v. Catrett,*
   477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) .........................................................5

*Corbis Corp. v. Amazon.com, Inc.,*
   351 F.Supp.2d 1090 (W.D. Wash. 2004) .........................................................................5

*Heffron v. Adamar of New Jersey, Inc.,*
   270 F. Supp. 2d 562 (D.N.J. 2003) .................................................................................6

*Irwin Katz & Assocs., Inc. v. Concepts In Health, Inc.,*
   Civ. Action No. 3:13-cv-1217, 2014 WL 6471486 (D.N.J.Nov. 19, 2014)..........................7

*Lindy Pen Co. v. Bic Pen Corp.,*
   982 F.2d 1400 (9th Cir. 1993) ......................................................................................20

*Mattel, Inc. v. MGA Entertainment, Inc.*
   616 F.3d 904 (9th Cir. 2010) ........................................................................................22

*Medtrica Solutions LTD. v. Cygnus Medical LLC,*
   No. C12-538RSL, 2014 WL 813897 (W.D. Wash. Mar. 3, 2014) .......................................5

*Montclair United Soccer Club v. Count Me In Corp.,*
   No. C08-1642-JCC, 2009 WL 2985475 (W.D. Wash. Sept. 14, 2009)..............................19

*Music Ltd. V. A.V.E.L.A., Inc.,*
   778 F.3d 1059 (9th Cir. 2015) ......................................................................................20

*Penske Logistics, Inc. v. KLLM, Inc.,*
   285 F. Supp. 2d 468 (D.N.J. 2003) ..............................................................................6, 8

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

*Polygon Nw. Co. LLC v. Louisiana-Pac. Corp.*,
   No. C11-620 MJP, 2012 WL 2504873 (W.D. Wash. June 28, 2012) ................................ 19

*RIPL Corp. v. Google Inc.*,
   No. 2:12-CV-02050-RSM, 2014 WL 1350810 (W.D. Wash. Apr. 3, 2014) ................ 14, 16

*Rolex Watch, U.S.A., Inc. v. Michel Co.*,
   179 F.3d 704 (9th Cir. 1999) ......................................................................... 22

*Rolley, Inc. v. Younghusband*,
   204 F.2d 209 (9th Cir. 1953) ............................................................................. 6

*Sutton v. Williamsburg Winery, Ltd.*,
   No. 2:12-CV-00333-GEB, 2013 WL 5348127 (E.D. Cal. Sept. 23, 2013)
   *aff'd*, No. 13-17093, 2015 WL 5692045 (9th Cir. Sept. 29, 2015) ................................ 14, 15

*Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*,
   932 F.2d 1113 (5th Cir. 1991) ......................................................................... 18

*Taffy Original Designs, Inc. v. Taffy's Inc.*,
   No. 65 C 345, 161 U.S.P.Q. 707, 1966 WL 7124 (N.D.Ill. Oct. 31, 1966) ...................... 18

**Statutes**

15 U.S.C. § 1065 .......................................................................................... 4

15 U.S.C. § 1117(a) ...................................................................................... 19

15 U.S.C. § 1127 ...................................................................................... 14, 15

**Other Authorities**

J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition (4th
   ed. 2014) ......................................................................................... 6, 16

11 Williston on Contracts § 32:11 (4th ed.) ........................................................ 7

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

# I.    **PRELIMINARY STATEMENT**

After never before claiming rights in the ANGRY BIRDS trademark, and only after the worldwide ANGRY BIRDS video game phenomenon resulted in Hartz's successful sale of products based upon the video game characters, Plaintiff brought this lawsuit claiming she owns the mark and is therefore entitled to millions of dollars.  However, after extensive discovery, there is no evidence supporting the essential elements of Plaintiff's claims, including the contention that she owns and licensed the ANGRY BIRDS trademark to Hartz.  Nor is there any evidence that Hartz should have known Adams would belatedly claim to own the mark.

The testimony confirms that the parties' agreement was negotiated at arm's length by their legal counsel who deliberately made specific reference to any licensed property for the benefit of both parties. When asked to interpret the language of the parties' 2006 license agreement, its primary drafter confirmed that it specifies that all "Intellectual Property" licensed under the agreement is either listed in its Appendix B or shall be added in a future written amendment to the Agreement.  Neither the agreement and its appendices, nor any amendment references the trademark ANGRY BIRDS.

Ms. Adams has no relevant knowledge of the negotiation of her agreement with Hartz. Her contemporaneous notes regarding the drafting of the agreement do not mention any trademarks and her subsequent correspondence demonstrates that she never believed that she owned or licensed the ANGRY BIRDS mark. It is undisputed that Hartz paid Plaintiff the royalties owed for sale of the licensed products it sold under the parties' agreement and that Ms. Adams never raised a complaint or claimed ownership of the ANGRY BIRDS mark until nearly a decade later, when an estranged former Hartz employee convinced her she should seek to be paid "extra" on the line of products they developed "together" while he was an employee of Hartz.

128607.0001/6308929.1

1

**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

1    Even assuming that Plaintiff had rights in the ANGRY BIRDS trademark, the

2  undisputed facts demonstrate that she abandoned those rights due to non-use or forfeited them

3  through a "naked license" before she ever objected or filed a lawsuit against Hartz.

4    The Hartz products based upon Plaintiff's artwork were a dismal failure, resulting in

5  nationwide sales of less than $10,000 over four years. Plaintiff now seeks to recover the

6  entirety of the multi-million dollar profits Hartz earned on its subsequent sale of products

7  depicting artwork from the highly popular Rovio ANGRY BIRDS video game, an iPhone App

8  that was downloaded over a billion times, which Plaintiff's expert admits had a 90+% brand

9  awareness. As there is no evidence that Hartz willfully sought to confuse consumers by

10  marketing the Rovio-imaged product, and since Plaintiff has no evidence that demonstrates the

11  percentage of Hartz's sales of the Rovio-imaged product that is attributable to her alleged

12  rights, she is precluded from recovery of Hartz's profits as a matter of law.

13    As the record is devoid of any evidence that Plaintiff owns or licensed the ANGRY

14  BIRDS mark to Hartz, or that the Hartz-Rovio ANGRY BIRDS products bear any relation to

15  Ms. Adams or her intellectual property, her claims must be dismissed.

16  **II.    FACTUAL BACKGROUND**

17    **A.    The Adams/Hartz Agreement.**

18    Plaintiff is a contemporary painter who resides in Seattle, Washington. (Calvaruso

19  Decl., Ex. A at 14 [Compl. ¶ 10].)[1] Hartz is a pet product company headquartered in New

20  Jersey. (Calvaruso Decl., Ex. A at 14 [Compl. ¶ 11].) Hartz's marketing manager, Tim Ford, saw

21  Plaintiff's artwork at a 2006 festival and the parties' thereafter negotiated and executed a

22  Confidential Exclusive License Agreement dated November 20, 2006 (the "Agreement") to

23  license thirty-seven of Plaintiff's drawings of various animals, including birds, bears, gophers,

24  and rabbits. (Calvaruso Decl., Ex. A at 16 [Compl. ¶¶ 21-22].) Aside from her Agreement with

25  Hartz, Plaintiff has never used her artwork or other intellectual property in connection with the

26

---

[1] "Calvaruso Decl." refers to the Declaration of Andrea L. Calvaruso, dated October 6, 2015, filed in support hereof.

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

promotion, manufacture or sale of any products or merchandise (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 204:8-17].)

Under the Agreement, Plaintiff licensed to Hartz:

[O]n an exclusive basis (which shall also exclude Juli Adams) the Intellectual Property for the purpose of the use, manufacture, packaging, promotion, advertising, merchandising and sale of the Licensed Products in the Distribution Area in the Channels of Trade, provided that Hartz agrees not to produce two dimensional wall art other than for promotional, advertising, merchandising and sale purposes of the Licensed Products.

(Calvaruso Decl., Ex. A at 35 [Compl. Ex. A at Art. 2.1].)  Article 2.1 further provides: "Nothing set forth herein shall prohibit Hartz from selling any products or services whatsoever using the Intellectual Property or Hartz'[s] own intellectual property, whether in or outside of the Distribution Area, whether to the same customers of Juli Adams or otherwise."  (Calvaruso Decl., Ex. A at 35.)  The Agreement defines "Intellectual Property" as:

[A]ll intellectual property of Juli Adams licensed under this Agreement including (a) the intellectual property attached hereto as Appendix B and (b) such future intellectual property of Juli Adams as Hartz shall request from time to time, which additional intellectual property shall be added to this Agreement upon notice by Hartz to Juli Adams and pursuant to an amendment to this Agreement, which amendment shall have the same terms and conditions as set forth in this Agreement unless the parties otherwise agree in such amendment.

(Calvaruso Decl., Ex. A at 42.)  Appendix B of the Agreement, in turn, annexes thirty-seven pages of Plaintiff's drawings, six of which were drawings of birds.  (Calvaruso Decl., Ex. A at 43-80.)  No intellectual property was ever added to the Agreement by way of an Amendment. (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 149:2-8]; Ex. J at 251 [Marx Dep. 233:1-12].)

Article 8 of the Agreement grants Hartz the "right to file copyright and other intellectual property right filings, in its discretion, for all of the Licensed Products."  (Calvaruso Decl., Ex. A at 38.)  On May 22, 2007, Hartz and Plaintiff executed Amendment Number One to the Agreement, which amended the end of Article 8 to read as follows:

Hartz shall have the right to file copyright, trademark and other intellectual property right filings in Hartz's name, in its discretion, for all of the Licensed

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

3

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

Products.  Additionally, Hartz shall have the right to obtain the trademark "The Juli Adams Collection" in Hartz's name and use it for Hartz's products.

(Calvaruso Decl., Ex. A at 82 [Compl. Ex. B.])  Hartz owns U.S. Trademark Registration No. 3,473,227 for the mark ANGRY BIRDS as used in connection with "Pet toys."  (Calvaruso Decl., Ex. A at 19 [Compl. ¶ 33].)  This registration is now incontestable under Section 15 of the Lanham Act.  15 U.S.C. § 1065.  (Calvaruso Decl., Ex. O at 333.)

## B.   The Poor Sales of Hartz Products Using Plaintiff's Images.

In or around 2007, Hartz began selling a line of pet toys which were based on Plaintiff's licensed illustrations.  (Calvaruso Decl., Ex. A at 16 [Compl. ¶ 24]; Ex. P at 346.)  Hartz used the mark ANGRY BIRDS in connection with several cat toys based upon a handful of Ms. Adams' illustrations.  Hartz also manufactured other pet products based upon Ms. Adams' illustrations which were sold under different brand names.  (Calvaruso Decl., Ex. A at 16, 18 [Compl. ¶¶ 24, 31-32]; Ex. H at 2 [Yacovino Dep. 172:15-173:1; 186:22-187:10; 188:2-9].) The packaging for the products bearing the ANGRY BIRDS mark was created by Hartz and included certain of Plaintiff's illustrations.  The ANGRY BIRDS logo was not among the artwork Adams created for the packaging.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 155:2-20; 157:7-158:1].)  The packaging included the notice "Licensed from the art of Juli Adams," but did not contain any claim that Plaintiff owned any trademark rights related to the licensed products.  (Calvaruso Decl., Ex. A at 18 [Compl. ¶¶ 31-32].)

Plaintiff was paid quarterly royalties for all sales of the Licensed Products.  (Calvaruso Decl., Ex. U at 375; Ex. L at 313.)  The Licensed Products, however, were was not successful, and as such there were no sales of the Licensed Products after the 4th quarter of 2010. (Calvaruso Decl., Ex. P at 346.)  Out of four year sales of $338,700, only $9,899 were for sales of bird-imaged products.  (Calvaruso Decl., Ex. P at 346.)

## C.   Hartz's Agreement with Rovio to License the Popular Angry Birds Video Game Characters.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

On May 13, 2011, more than a year after Hartz stopped selling the Licensed Products, Hartz entered into a Merchandise License Agreement with Rovio Mobile Ltd. (the "Rovio Agreement"), the Finnish developer of the well-known Angry Birds iPhone game, for the use of Rovio's Angry Bird images or pet products.  (Calvaruso Decl., Ex. N at 326.)  At the time, the Rovio Angry Birds game had been downloaded by over 2.8 billion people, its Angry Bird characters had a 90+% brand awareness among consumers, and its characters were becoming a licensing phenomenon.  (Calvaruso Decl., Ex. K at 293 [Voth 73:3-18; 133:21-23].)  Hartz had the idea for a pet product using the popular Rovio Angry Birds images after seeing a children's toy product using the Rovio Angry Bird images.  (Calvaruso Decl., Ex. G at 213 [Briller Dep. 17:25-20:1]; Ex. I at 244 [Coacher Dep. 64:20-65:24].)  The products Hartz created and sold pursuant to the Rovio Agreement did not utilize any of Adams' artwork or other intellectual property.  (Calvaruso Decl., Ex. E at 196 [Mostman Dep. 99:7-100:5]; Calvaruso Decl, Ex. N at 326.)  Hartz sold products utilizing the Rovio intellectual property from 2011 to 2015.  (Calvaruso Decl., Ex. K at 293 [Voth Dep. Ex. 4].)

## III.   LEGAL AUTHORITY

Summary judgment is proper if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *Corbis Corp. v. Amazon.com, Inc.*, 351 F.Supp.2d 1090 (W.D. Wash. 2004) (Lasnik J.).  Once the moving party meets its initial burden of persuasion, the nonmoving party must produce evidence to support its claim.  *Medtrica Solutions LTD. v. Cygnus Medical LLC*, No. C12-538RSL, 2014 WL 813897, at *2 (W.D. Wash. Mar. 3, 2014), *citing Nissan Fire & Marine Ins. Co., Ltd. v. Fritz Cos., Inc.*, 210 F.3d 1099, 1102, 1103 (9th Cir. 2000).  Here, Plaintiff is required to present "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

### A.   No Evidence In The Record Supports Plaintiff's Ownership of the ANGRY BIRDS Trademark or Her License of the Trademark To Hartz

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

5

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

Each of Plaintiff's claims rests on the allegation that she owned and licensed Hartz the right to use the ANGRY BIRDS trademark pursuant to the Agreement.  There is no genuine issue of fact to support an inference that Ms. Adams owns rights in the ANGRY BIRDS trademark, either via her use in commerce in connection with pet toys or her Agreement with Hartz.  Therefore, her claims should be dismissed as a matter of law.

### i.   Plaintiff Owned No Rights in the Mark At The Time of The Agreement

The Court noted in its prior decision that a determination must be made as to what Ms. Adams owned "at the time the Agreement was signed."  (Calvaruso Decl., Ex. C at 110.) Adams did not own the trademark ANGRY BIRDS at that time.  Plaintiff admitted that she did not use the ANGRY BIRDS terminology – at all – prior to the Agreement with Hartz, let alone use in connection with the sale of goods.  (Pl. Dep. 202:14 - 204:3.)  As trademark rights are derived by use, Adams did not own any rights in the trademark at the time the Agreement was signed.  *See generally* J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 16:11 (4th ed. 2014) [hereinafter "McCarthy"]; *see also Rolley, Inc. v. Younghusband*, 204 F.2d 209, 212 (9th Cir. 1953) ("He who first affixes a trade-mark upon his goods is its owner, not the person who first conceives the idea.").

### ii.   The ANGRY BIRDS Mark Was Not Licensed by the Agreement

Under New Jersey law,[2] summary judgment is proper where the contract is unambiguous as a matter of law.  *Penske Logistics, Inc. v. KLLM, Inc.*, 285 F. Supp. 2d 468, 472 (D.N.J. 2003).  In evaluating whether a contract is ambiguous, a court should not "torture the language of a contract to create ambiguity where, fairly considered, none exists."  *Id.* Nevertheless, a court must have a reference point to determine if words may reasonably have different meanings.  *Heffron v. Adamar of New Jersey, Inc.*, 270 F. Supp. 2d 562, 570 (D.N.J. 2003) (citing *Mellon Bank, N.A. v. Aetna Business Credit, Inc.*, 619 F.2d 1001, 1011 (3d Cir.

---

[2] The Agreement provides that New Jersey law applies to its validity, interpretation and performance.  (Calvaruso Decl., Ex. A at 15, 40) [Compl. ¶ 16, Ex. A at Art. 10.14].)

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

1980)).[3]  It is appropriate to consider extrinsic evidence, such as "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning," to assist with the determination of ambiguity, even if it appears on its face to be free from ambiguity.  *Id.* (internal citations and quotations omitted).  However, under the principles of contract interpretation, a contract should not be given an interpretation which renders a term or terms superfluous or meaningless.  11 Williston on Contracts § 32:11 (4th ed.)

Summary judgment is warranted where extrinsic evidence confirms the language is not ambiguous, or the interpretation proffered by one party is unreasonable.  *See, e.g.*, *Irwin Katz & Assocs., Inc. v. Concepts In Health, Inc.*, Civ. Action No. 3:13-cv-1217, 2014 WL 6471486, at *7-8 (D.N.J. Nov. 19, 2014); *Woodbury*, 285 F. Supp. 2d at 550.  Here, the Agreement defines Intellectual Property as:

> [A]ll intellectual property of Juli Adams licensed under this Agreement including (a) the intellectual property attached hereto as Appendix B and (b) such future intellectual property of Juli Adams as Hartz shall request from time to time, which additional intellectual property shall be added to this Agreement upon notice by Hartz to Juli Adams and pursuant to an amendment to this Agreement, which amendment shall have the same terms and conditions as set forth in this Agreement unless the parties otherwise agree in such amendment.

(Calvaruso Decl., Ex. A at 42 [Compl. Ex. A at App'x A].)  Accordingly, Intellectual Property is defined as that which was owned by Adams[4] and "licensed under this Agreement," as specified in two groupings: (a) materials in Appendix B and (b) additional materials added by amendment.

---

[3] These principals apply equally in Washington.  *See, e.g.*, *Capital Ventures International v. Network Commerce, Inc.*, No. C02-0682L 2006 WL 681033 (W.D. Wash. Mar. 16, 2006) (Lasnik, J.) (noting that the subjective intent of the parties is generally irrelevant if it may be determined from the actual language of the contract, but examining extrinsic evidence may assist the court in determining whether language is ambiguous).

[4] The Court's prior Decision stated that the "definition of 'Intellectual Property' is 'all intellectual property of [Plaintiff]'" (Calvaruso Decl. Ex. C at 114.)  However, it is clear that Ms. Adams was not licensing all of her Intellectual Property as confirmed by the language in Section 2.1 where she carved out her own exclusive right to sell the illustrations as two-dimensional artwork.  (Calvaruso Decl., Ex. A at 35 [Compl. Ex. A, Art. 2.1].)

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

7

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

The trademark ANGRY BIRDS does not appear anywhere in the language of the Agreement (including Appendix B) or in any amendments.  Ms. Adams herself confirms these facts.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 248:1-14]; Ex. X at 399; Ex. J at 251[Marx Dep. 233:2-12].)  This Court previously held that because the Complaint alleged facts that raised a "plausible inference" that ANGRY BIRDS was part of Plaintiff's Intellectual Property licensed to Hartz under the Agreement, it should "discern and implement the common intention of the parties," and "consider what is written in the context of the circumstances at the time of drafting and to apply a rational meaning in keeping with the expressed general purpose." (Calvaruso Decl., Ex. C at 110.)

The parties' main disagreement is with respect to the word "including" in Section 1.8 of Appendix A.  (Calvaruso Decl., Ex. B at 83.)  Plaintiff seeks to *read into* the definition of Intellectual Property the noticeably absent phrase, "but not limited to" after the word "including."  It is only the addition of such non-existent language that would create ambiguity. Indeed, without the insertion of the language Plaintiff suggests, the definition is clear – the Intellectual Property being licensed includes what is depicted in Appendix B, plus anything later added by amendment.  The use of the word "including" prior to a defined list of two options does not expand the definition.  Indeed, it would be hard to replace the word "including" with another, more precise, word.  The Court should therefore not "torture the language of a contract to create ambiguity where, fairly considered, none exists." *Penske Logistics*, 285 F. Supp. 2d at 472.

Moreover, adding the phrase "but not limited to" after the word "including" would render meaningless the balance of the definition, which is contrary to the principles of contract interpretation.  If the language defining Intellectual Property is to be read as Plaintiff suggests, there is no need to specify the two categories of material included at all.  If the definition of Intellectual Property was intended to include unidentified future intellectual property, there would be no reason to specify that such work must be added by amendment.  Indeed, Plaintiff's suggested interpretation would transform detailed and precise language in the Agreement into

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

8

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

imprecise language that does not specify exactly what property is licensed. This is contrary to the purpose of a license agreement. As Hartz former General Counsel testified "We wanted a very specific understanding of what is being licensed.  For the benefit of both parties." (Calvaruso Decl., Ex. J at 251 [Marx Dep. 77:24-78:25]).

### iii.   **The Evidence Does Not Support Plaintiff's Contractual Interpretation**

Extensive discovery[5] demonstrates that there is no evidence suggesting that the definition of "Intellectual Property" is ambiguous, or to support a claim that the parties intended the definition to include the trademark ANGRY BIRDS at the time it was executed.

### 1   Testimony Of The Agreement's Primary Drafter Supports Hartz's Interpretation

The Agreement was drafted by Max Marx, Hartz's former General Counsel, together with Todd Ripley, an attorney who represented Ms. Adams' interests.[6]  The Agreement was negotiated at arms-length and Adams' attorney provided several rounds of proposed edits. (Calvaruso Decl., Ex. J at 251 [Marx Dep. 223:2-6; 297:25-298:16]; Ex. F at 203 [Ford Dep. 202:9-203:5; 209:22-210:22].)  Ms. Adams confirmed that Mr. Ripley negotiated on her behalf and that she did not discuss the terms of the Agreement with anyone at Hartz.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 83:19-85:21; 86:8-87:12; 88:24-90:1; 96:7-15].)  Mr. Marx clearly explained the parties' intended meaning of the Section 1.8:

> A. [Section] 1.8 states it's all Intellectual Property licensed under the agreement including, and then it defines what we're talking about, A and B. It doesn't go outside of A and B. It doesn't talk about a C. It doesn't refer to a C or a D. It's just what's in A and B. And A being Appendix B. And Appendix B is, I think we saw, 37 pages of drawings, and any of the -- any of the matters inside those drawings. That is the limit of the grant clause in this license

---

[5] Discovery included deposition testimony of the parties and former Hartz employees (including the former Hartz attorney who drafted the agreement with Plaintiff's counsel Todd Ripley), and production of over 12,000 documents, including Plaintiff's file containing her notes regarding drafts of the Agreement and redlined drafts of the Agreement.  Notably, as Plaintiff never disclosed Mr. Ripley as a person with knowledge, he was not deposed.
[6] According to Ms. Adams, Mr. Ripley was not working as an attorney at the time of the negotiations, but had graduated from law school and practiced law for a period of time prior to the negotiations.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 83:22-84:3; 84:21-85:1].)

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

agreement. The only way to add on to the grant clause in the Intellectual Property definition is any future amendment.

Q. Okay. You said the language you used was just what is in A and B. Is it your convention [sic], then, that the word "including" means just what is in?

A. Precisely.

Q. So you read "only including" to mean – you read "including" to mean "only including."

[Objection]

A. I read "including" to mean A and B and nothing more.

Q. But you didn't write "A and B and nothing more"?

[Objection]

A.  I believe this clause is clear and it's clear not only by the wording itself, but it's also clear from our practice, in that I ask the parties to bring to me what it is they're licensing. They could bring everything under the sun, their entire portfolio, they could bring an open-ended description of future work, they could bring me a gallery, but the parties brought me apparently 37 pages, and that is the license, and then for the future, if they have anything to accrete or add to that, then my practice then, and it is today, that the parties have to approach us and tell us what that addition is, and there would be -- and if there was a clear understanding of what that attachment is, we would then do an amendment.

Q. So the intention in splitting it into A and B was to have A be everything that's going to be licensed up until the time the license is signed, and B is anything that's going to be licensed after the license is signed?

*   *   *

A. That's correct.

(Calvaruso Decl., Ex. J at 251 [Marx Dep. 74:13-77:14]; *see also* Ex. J at 251 [Marx Dep. 31:23-32:7; 70:1-20; 71:19-73:7; 76:9-77:3; 78:8-25; 163:11-164:14; 227:8-20; 228:8-230:2; 232:18-233:12].)

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

Mr. Marx's unrebutted testimony is that: what was being licensed in the Agreement was Ms. Adams' artwork (Calvaruso Decl., Ex. J at 251 [Marx Dep. 43:18-44:14]); had the parties expressed an intent to license a trademark, his practice, after more than 30 years of experience in drafting such agreements, would be to specify the trademark that was being licensed (Calvaruso Decl., Ex. J at 251 [Marx Dep. 244:2-245:10]); the term "Angry Birds" was never mentioned to him by the parties in connection with the drafting of the Agreement (Calvaruso Decl., Ex. J at 251 [Marx. Dep. 223:7-14]); and had such a discussion taken place he would have specifically included the trademark in the agreement.  (Calvaruso Decl., Ex. J at 251 [Marx Dep. 270:7-22].)

## 2   No Testimony Supports Plaintiff's Interpretation

Scott Yacovino, a former Hartz marketing manager responsible for marketing of the Plaintiff-imaged products in 2007-2008 testified that he understood Hartz owned the trademark ANGRY BIRDS and no one ever told him otherwise.  (Calvaruso Decl., Ex. H at 228 [Yacovino Dep. 205:5-22; 210:2-5].)

Ms. Adams was not involved in drafting or negotiating the Agreement at all and has no recollection of any particular discussions about the language.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 83:19-85:21; 86:8-87:5; 96:7-15].)  Nor does she now remember what she understood the language to mean at the time the Agreement was negotiated or signed.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 103:9-16; 104:11-105:1; 107:7-16].)  Ms. Adams admitted that she did not did not discuss the terms of the Agreement with Hartz, and that Hartz did not make any representations outside of the Agreement.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 74:7-16; 84:7-9; 87:3-12; 89:24-90:1].)  Ms. Adam's counsel, Mr. Ripley, negotiated directly with Hartz's legal team.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 83:19-22].)  Ms. Adams communicated her suggested changes to Mr. Ripley and Hartz edited the language accordingly.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 96:16-101:14; 107:7-109:11; 116:13-18].)

## 3   No Documents Support Plaintiff's Interpretation

None of Ms. Adams' notes regarding the language of the Agreement drafts, nor the

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

redlined versions of the Agreement including her proposals, addressed the definition of "Intellectual Property" or mentioned the trademark ANGRY BIRDS or any other trademark. (Calvaruso Decl., Ex. Z at 403; Ex. S at 364, Ex. T at 367, Ex. M at 315.)  Nor are there any other emails or documents that demonstrate that the parties intended the ANGRY BIRDS trademark was licensed under the Agreement.

As Ms. Adams admits in her 2013 correspondence with Mr. Ford: "Angry Birds was not listed [in the Agreement]. Nor was any other of the designs, or the names of the designs." (Calvaruso Decl., Ex. X at 399; Calvaruso Decl., Ex. D at 121 [Pl. Dep. 264:22-23].)  Ms. Adams did not find or produce any emails "linking the name [Angry Birds] to the agreement." (Calvaruso Decl., Ex. Y at 401; Ex. D at 121 [Pl. Dep. 244:10-24].)  She acknowledged that Appendix B "supposedly lists what was trademarked" under the Agreement.  (Calvaruso Decl., Ex. R at 361; Ex. D at 121 [Pl. Dep. 255:20-256:5; 258:7-14]) and that Appendix B does not reference the trademark ANGRY BIRDS (Calvaruso Decl., Ex. A at 43-80 [Compl. Ex. A at App'x B]; Ex. D at 121 [Pl. Dep. 248:1-10]; Ex. X at 399.)

### 4    The Parties' Conduct Supports Hartz's Interpretation

On May 22, 2007, Plaintiff signed Amendment Number One to the License Agreement, which provides that "Hartz shall have the right to file copyright, trademark and other intellectual property right filings in Hartz's name, in its discretion, for all of the Licensed Products." (Calvarso Decl., Ex. A at 82 [Compl. Ex. B].)  The Amendment does not state or suggest that Plaintiff would have any ownership rights over those intellectual property filings.[7] Ms. Adams executed the Amendment after her attorney reviewed it.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 147:4-12].)  Hartz thereafter filed trademark applications in its own name without any objection from Ms. Adams.  (Calvaruso Decl., Ex. D at 121[Pl. Dep. 191:12-14]; Ex. H at

---

[7] Plaintiff merely alleges—without any proof—that, at the time Hartz registered the ANGRY BIRDS mark, she believed that Hartz was doing so "on [her] behalf" because she "didn't have the means" to do so.  (Pl. Dep. 189:7-13.)  The Agreement does not support her understanding, nor are there any emails or other documents in the record that support this claim.  Ms. Adams could not offer any details or identify a single person with whom she had conversations regarding Hartz filing trademark applications on her behalf. (Pl. Dep. 189:7-22)

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

228 [Yacovino Dep. 205:5-19]; Ex. J at 251 [Marx Dep. 255:7-256:4].)  Mr. Marx did not

believe that Hartz was filing trademark applications on Adams' behalf and said that, if that was

the agreement of the parties, he would not have instructed the trademark filings in Hartz's

name.  (Calvaruso Decl., Ex. J at 251 [Marx Dep. 225:15-21; 253:23-256:4].)  Ms. Adams also

testified that Hartz told her she could not use the ANGRY BIRDS mark, yet she did not object[8].

(Calvaruso Decl., Ex. D at 121 [Pl. Dep. 169:10-170:14; 185:7-9; 185:15-23; 191:12-14

238:25-239:12; 261:9-24]; *see also* Ex. H at 228 [Yacovino Dep. 205:5-22]; Ex. J at 251 [Marx

Dep. 255:7-256:4].)

        Prior to the lawsuit Adams did not even contemplate who owned the ANGRY BIRDS

trademark, let alone consider herself the owner.  Tim Ford, who first approached Ms. Adams

on behalf of Hartz in 2006, later left Hartz's employ in January 2007 amid allegations of

serious wrongdoing. (Calvaruso Decl., Ex. F at 203 [Ford Dep. 61:3-5, 406:20-25]; Yacovino

Decl., Ex. H at 227 210:7-212:12).  In September 2013, Mr. Ford emailed Ms. Adams and

represented to her that the Rovio "angry birds ended up making Hartz some nice money, and

hopefully you got a piece." (Calvaruso Decl., Ex. W at 392.)  In ensuing correspondence, Mr.

Ford suggested that it would be "[w]orth having an attorney look into as Hartz made millions as

a result" (Calvaruso Decl., Ex. V at 390), and later that day he contacted a trademark attorney

to inquire about claims Adams might have against Hartz (Calvaruso Decl., Ex. R at 359-60.)  In

response to Ford's persistent inquiries, in November 2013 *Adams asked Mr. Ford*, "[w]ould the

name Angry Birds be my intellectual property?"  (Calvaruso Decl., Ex. Y at 401.)  In fact, Ms.

Adams testified she did not even understand what Ford thought her claims might be with

respect to the Rovio products.  (Calvaruso Decl., Ex. D, at 121 [Pl. Dep. 246:1-23; 267:9-15].)

Ms. Adams was also aware that Rovio had commenced "ubiquitous" use of the trademark

---

[8] Though she testified that she was involved in designing and approving the product packaging (Pl. Dep. 154:23-155:11), which clearly refers to the toys as HARTZ® ANGRY BIRDS™, and mentions a license only of Adams' "artwork," she never objected.  As Mr. Marx testified, if the intent was for Adams to own the ANGRY BIRDS mark, the package would have legal language acknowledging her ownership.  (Marx Dep. 269:4-270:22.)

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT                    13

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

ANGRY BIRDS on a wide variety of products after Hartz sold her licensed products, yet she never believed Rovio should have asked her permission to use the name, nor did she complain to Rovio that they should compensate her for use of the ANGRY BIRDS trademark. (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 204:22-205:6; 205:9-206:4; 206:8-16].)  It is therefore clear that Ms. Adams never believed she owned or licensed the ANGRY BIRDS trademark to Hartz, either at the time she signed the Agreement or thereafter.

Discovery confirms that the Intellectual Property licensed under the Agreement is confined to the illustrations contained in Appendix B and that there were no contractual amendments adding Intellectual Property to the Agreement.  The ANGRY BIRDS trademark was simply not part of the licensed intellectual property.  As Ms. Adams cannot prove that she ever owned any rights in the ANGRY BIRDS trademark, her claims should be dismissed.

**B.      Adams Abandoned Any Rights in the ANGRY BIRDS Mark**

**i.      Adams Abandoned Any Trademark Rights Due to Non-Use**

Ms. Adams abandoned any rights she may have had in the ANGRY BIRDS trademark as the result of her failure to use the mark in commerce, without an intention to resume use.  The law is clear that:

> A mark shall be deemed to be "abandoned" if . . . its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances. Nonuse for 3 consecutive years shall be prima facie evidence of abandonment. "Use" of a mark means the bona fide use of such mark made in the ordinary course of trade, and not made merely to reserve a right in a mark.

15 U.S.C. § 1127.  In *RIPL Corp. v. Google Inc.*, No. 2:12-CV-02050-RSM, 2014 WL 1350810, at *3 (W.D. Wash. Apr. 3, 2014), this Court granted summary judgment where the plaintiff failed to use its trademark for three consecutive years and could neither rebut the presumption of abandonment nor demonstrate an intention to resume use.  *See also Sutton v. Williamsburg Winery, Ltd.*, No. 2:12-CV-00333-GEB, 2013 WL 5348127, at *4 (E.D. Cal. Sept. 23, 2013) *aff'd*, No. 13-17093, 2015 WL 5692045 (9th Cir. Sept. 29, 2015) (summary

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

14

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

judgment granted where the plaintiff failed to rebut the presumption of abandonment created by its three years of non-use).

Ms. Adams never used the ANGRY BIRDS trademark prior to her relationship with Defendant.  (Pl. Dep. 202:14-203:21.)  She also did not make any use of the ANGRY BIRDS mark in commerce aside from her alleged license to Hartz for use in connection with the Licensed Goods under the Agreement.  (Pl. Dep. 203:22-204:20.)  Her alleged rights are solely derived from Hartz's use of the mark in connection with the Licensed Goods created from her artwork.  (Calvaruso Decl., Ex. A at 29, 31 [Compl. ¶¶ 98, 109]; Calvaruso Decl. Ex. B at 83.)  There is also no dispute that Hartz stopped selling the products bearing the ANGRY BIRDS mark pursuant to its Agreement with Adams no later than end of 2010.  (Calvaruso Decl., Ex. D, at 121 [Pl. Dep. 290:17-19]; Ex. U at 375; Ex. L at 313.)  Adams herself asserts that Hartz's use of the ANGRY BIRDS mark after 2010 in connection with the Rovio video game artwork was "without [her] knowledge, permission [and] without legal authority."  (Calvaruso Decl., Ex. A, at 13, 22, 23 [Compl. ¶¶ 6, 48, 54].)  Therefore, any use of the ANGRY BIRDS mark claimed by Ms. Adams via the Agreement ceased no later than December 31, 2010.  Ms. Adams filed suit alleging trademark infringement on August 4, 2014, more than three years after the last sale of products that were the subject of her license agreement with Hartz.  (*See* Calvaruso Decl., Ex. A.)  Such non-use is *prima facie* evidence creating a rebuttable presumption that she abandoned any trademark rights without intent to resume use.  15 U.S.C. § 1127; *Sutton*, 2013 WL 5348127, at *2.

Ms. Adams must rebut this presumption of abandonment by showing evidence that as of August 4, 2014: (a) she was actually using the ANGRY BIRDS mark in connection with the promotion and sale of pet toys in commerce; or (b) she had demonstrable intention to resume such use of the mark in commerce.  *Id.* at *3.  Ms. Adams testified that: (a) she never promoted or sold any products in commerce under the ANGRY BIRDS mark (or any other mark) aside from the licensed products that were manufactured and sold by Hartz; (b) she thereafter neither used nor attempted to make any use of the ANGRY BIRDS mark either alone or with any other

15

party; and (c) she has no intention to make any use of the ANGRY BIRDS mark in the future. (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 52:25-53:12; 202:4-204:3; 204:8-20].)  Accordingly, any rights that Ms. Adams had in the ANGRY BIRDS trademark through Hartz's use of the mark via the parties' Agreement were abandoned as a matter of law before she brought suit against Hartz in August 2014.  Therefore, Plaintiff's claims for trademark infringement, false designation of origin, and declaratory judgment should be dismissed.  *See e.g.*, *RIPL Corp. v. Google Inc.*, 2014 WL 1350810, at *3.

### ii.   <u>Adams Abandoned Any Rights Via A Naked License</u>

Given both the terms of the Agreement and the conduct of the parties, there is no question that any trademark license was a "naked" one, resulting in an automatic abandonment of any trademark rights Ms. Adams arguably owned.  "[U]ncontrolled or 'naked' licensing may result in the trademark ceasing to function as a symbol of quality and controlled source." *Barcamerica Int'l USA Trust v. Tyfield Importers, Inc.*, 289 F.3d 589, 596 (9th Cir. 2002) (citing McCarthy § 18:48, at 18-79 (4th ed. 2001)).  "Consequently, where the licensor fails to exercise adequate quality control over the licensee, a court may find that the trademark owner has abandoned the trademark, in which case the owner would be estopped from asserting rights to the trademark." *Id.* (internal citations omitted).  "Such abandonment "is purely an 'involuntary' forfeiture of trademark rights," for it need not be shown that the trademark owner had any subjective intent to abandon the mark." *Id.* (citing McCarthy § 18:48, at 18–79).

"When deciding summary judgment on claims of naked licensing, [courts] first determine whether the license contained an express contractual right to inspect and supervise the licensee's operations." *Id.* at 516.  "The absence of an agreement with provisions restricting or monitoring the quality of goods or services produced under a trademark supports a finding of naked licensing." *Id.*  The Agreement makes no mention of Adams' inspection of the quality of the licensed products.  (Calvaruso Decl., Ex. A; Calvaruso Decl. Ex. B at 83.) Courts have "excused the lack of a contractual right to control quality" in only two circumstances: (1) where "the licensor demonstrate[s] actual control through inspection or

**LANE POWELL PC**
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

supervision," *Id.* at 517; and (2) where "the licensor and licensee [are] involved in a 'close working relationship,'" such that "the licensor is familiar with and relies upon the licenses own efforts to control quality," *Id.* at 518.

There is no evidence suggesting that Ms. Adams knew or even asked about the process of manufacture of the Licensed Goods, which factories were used to manufacture the Licensed Goods, or what quality control measures Hartz exercised with respect to the Licensed Goods. Nor is there any evidence to suggest that Hartz ever sought or received Ms. Adams' guidance or supervision with respect to such matters.  When asked to explain the process between the time she reviewed her artwork as depicted in three-dimensional prototypes and Hartz's commercializing the pet toys, Adams admitted: "Well, that's kind of their thing.  That's what they did."  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 76:21-77:4].)  Adams also testified that aside from reviewing early prototypes and providing some particular artwork that Hartz incorporated into the package design, she was not involved in, nor did she have knowledge regarding, the manufacture or inspection of the products before they went to market. (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 154:14-158:5].)

The extent of her inspection of the licensed products was a mere review of some prototypes of certain products for the sole purpose of ensuring that the three-dimensional rendering was faithful to her two-dimensional artwork of the birds, consistent with her artistic "style" and "vision" of what her drawings of the birds would look like as a plush toy. (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 160:8-161:9].)  In her own words, Ms. Adams' "job was to make sure that [her] drawings were interpreted the way that [she] envisioned them to be interpreted three-dimensionally."  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 161: 7-9].)  Ms. Adams did not even review the sample prototypes for all of the products created from her designs, nor any of the final products or packaging before they went to market, and testified that she was "not necessarily" happy with the ultimate product as it was sold in the marketplace.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 158:9-11; 200:25-201:2; 201:7-18].) Nor is there any evidence that Ms. Adams made any periodic inspections of the licensed goods.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

Such review of prototype samples does not constitute quality control efforts sufficient to defeat an abandonment claim. *See, e.g.*, *Barcamerica*, 289 F.3d at 596-97 (plaintiff's trademark rights were abandoned by failure to exercise quality control where plaintiff merely reviewed prototype samples, but was not otherwise involved with quality control).

Scott Yacovino, the Hartz manager in charge of the products created from Ms. Adams' drawings, confirmed that it was Hartz and not Ms. Adams who manufactured the product and that Hartz (not Adams) had final approval rights regarding the appearance of the products and packaging before they went to sale. (Calvaruso Decl., Ex. H at 227 [Yacovino Dep. 196:19-22].) In fact, Mr. Yacovino testified that, at the request of a retailer, changes were made to toys bearing Ms. Adams' bird designs after the initial prototypes were created, yet such changes to the product were never discussed with Ms. Adams. (Calvaruso Decl., Ex. H at 227 [Yacovino Dep. 199:5-200:19]; Ex. D at 121 [Pl. Dep. 193:7-17].) Ms. Adams admitted that she is not even sure whether Hartz implemented any of her suggested changes to the products or whether it sold the products under names she allegedly suggested. (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 150:17-151:6; 153:10-18; 182:5-7; 185:24-186:3;188:25-189-3]; *see also* Ex. Q at 347.) Similarly, Hartz's in-house counsel at the time confirmed that he was responsible for reviewing the final packaging, including the intellectual property rights language, and did not provide the packaging to Ms. Adams or her attorney for approval. (Calvaruso Decl., Ex. J at 251 [Marx Dep. 266:14-267:21; 269:24-270:2].)

There is also no evidence that Ms. Adams and Hartz had a long-term working relationship prior to entering into the Agreement of the sort that courts have found might excuse her failure to exercise quality control over the products. *Barcamerica*, 289 F.3d at 587 (citing *Transgo, Inc. v. Ajac Transmission Parts Corp.*, 768 F.2d 1001, 1017-18 (9th Cir. 1985) (ten year association with licensee and was familiar with his ability and expertise); *Taco Cabana Int'l, Inc. v. Two Pesos, Inc.*, 932 F.2d 1113, 1121 (5th Cir. 1991) (close working relationship for eight years); *Taffy Original Designs, Inc. v. Taffy's Inc.*, No. 65 C 345, 161 U.S.P.Q. 707, 713, 1966 WL 7124 (N.D.Ill. Oct. 31, 1966) (licensor and licensee were sisters

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

18

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

in business together for seventeen years).  Ms. Adams testified that she did not have any

dealings with Hartz or Tim Ford prior to her engagement by the company and testified that she

and Ford did not have a close relationship.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 48:23-

49:8; 209:21-22].)  Accordingly, Ms. Adams abandoned any trademark rights she may have

had in the ANGRY BIRDS mark by failing to supervise or participate in the quality control of

the manufacture of the licensed products.

C.    **Plaintiff's Unjust Enrichment Claims Fail As A Matter of Law**

Plaintiff alleges that Hartz was unjustly enriched by "selling Rovio-themed 'Angry

Birds' pet toys when it no longer was the owner of the 'Angry Birds' trademark for such

products." (Calvaruso Decl., Ex. A at 27 [Compl. ¶ 80].)  Plaintiff's claim for unjust

enrichment fails as a matter of law because there can be no claim for unjust enrichment

where—as here—an express contract governs the parties' rights.  *Polygon Nw. Co. LLC v.

Louisiana-Pac. Corp.*, No. C11-620 MJP, 2012 WL 2504873, at *6 (W.D. Wash. June 28,

2012) ("a plaintiff who is a party to a 'valid express contract is bound by the provisions of that

contract' and may not bring a claim for unjust enrichment for issues arising under the contract's

subject matter); *Montclair United Soccer Club v. Count Me In Corp.*, No. C08-1642-JCC, 2009

WL 2985475, at *7 (W.D. Wash. Sept. 14, 2009) (unjust enrichment claim dismissed where the

plaintiff conferred a benefit upon the defendant pursuant to an express contract).

D.    **Plaintiff Cannot Recover Hartz's Profits As a Matter of Law**

Plaintiff seeks to recover all profits made by Hartz on its sales of Rovio-imaged Angry

Birds products.  Plaintiff relies on the expert report of Drew Voth who calculated that Hartz

earned profits of $ 5.2 million on the Rovio licensed products.  (Calvaruso Decl., Ex. K at 293

[Voth Dep. 135:17-21].)  The undisputed facts show that there is no support for this theory.

i.    **Plaintiff Cannot Demonstrate That Hartz Willfully Intended to Create
Consumer Confusion**

A prevailing plaintiff may recover the defendant's profits under the Lanham Act

"subject to principles of equity" 15 U.S.C. § 1117(a).  To obtain an award of defendant's

**DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT**

19

**LANE POWELL** PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

profits – as distinguished from plaintiff's lost profits – the plaintiff must prove willfulness in deceiving consumers.  *See e.g., Fifty-Six Hope* Rd. *Music Ltd. V. A.V.E.L.A., Inc*., 778 F.3d 1059, 1073-74 (9th Cir. 2015); *Adray. Adry-Mart, Inc*. 76 F.3d 984, 988 (9th Cir. 1995), as amended on denial of reh'g (Feb. 15, 1996).  In this context, "[w]illful infringement carries a connotation of deliberate intent to deceive" such that awarding profits "is proper only where the defendant is 'attempting to gain the value of an established name of another.'" *Fifty-Six Hope*, 778 F.3d at 1073-74.  As stated by the Ninth Circuit in *Lindy Pen Co. v. Bic Pen Corp*., 982 F.2d 1400, 1405 (9th Cir. 1993), *superseded by statue on unrelated grounds*, this standard applies "only in those cases where the infringement is 'willfully calculated to exploit the advantage of an established mark.'"  The Court rejected a claim for Bic's profits since "Lindy's mark was weak and that there was no evidence of actual confusion" *Id*. at 1406; *see also Carl Zeiss Stiftung v. VEB Carl Zeiss Jena*, 433 F.2d 707 (2d Cir. 1970) ("[I]t is necessary to show 'not only that the infringer infringed, but that he did so with the deliberate intent to cause confusion, mistake or deceived purchasers; in other words, to purposely palm off the infringer's goods as those of the infringed'") (citing *Everst & Jennings, Inc. v. E&J Manufacturing Co*., 263 F.2d 254, 262 (9th Cir. 1958)).

Here, even assuming that plaintiff owned the ANGRY BIRDS mark, there is no evidence that the public was aware of that mark prior to the Rovio video game.  Therefore, Hartz had no motive to deceive consumers into believing the Rovio products were associated with Ms. Adams, her intellectual property, or the products Hartz created pursuant to its Agreement with Plaintiff. The ANGRY BIRDS trademark used to promote and sell Licensed Goods designed from plaintiff's artwork was exceedingly weak, indeed virtually non-existent. Hartz's total nationwide sales of Licensed Goods using Plaintiff's bird artwork was $9,889. Only $2,778 of those sales were products branded with the ANGRY BIRDS mark.  (Calvaruso

20

Decl., Ex. P at 346.)[9]  Even Plaintiff's expert Drew Voth testified that he was totally unfamiliar with the Hartz ANGRY BIRDS products derived from Plaintiff's bird designs. And he confirmed that a trademarked product with minimal sales created minimal brand awareness. (Calvaruso Decl., Ex. K at 293 [Voth Dep. 74:9-18; 127:21-128:6; 132:24-134:15].)  Indeed, Plaintiff can point to no evidence of consumer confusion resulting from Hartz's use of the ANGRY BIRDS mark on the Rovio products and even Plaintiff admitted that no one ever asked her if the ANGRY BIRDS video game was associated with her or her pet toys. (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 206:5-7; 207:14-18].)

It is undisputed that Hartz's interest in selling its Rovio-imaged products was based on the world-wide phenomenon of the Rovio video game characters.  (Calvaruso Decl., Ex. G at 213 [Briller Dep. 66:9-22; 78:2-23; 108:13-17; 121:5-10; 159:14-22].)  Mr. Voth acknowledged that the game had been down-loaded by over 2.8 billion people world-wide and had become a licensing phenomenon.  (Calvaruso Decl., Ex. K at 293 [Voth Dep. 73:3-14; 133:21-23].)  Plaintiff herself testified that the video game was "ubiquitous" and that she saw many products bearing the video game.  (Calvaruso Decl., Ex. D at 121 [Pl. Dep. 205:9-17; 206:8-16].)  Hartz came up with the idea for a Rovio-imaged pet product after viewing a Rovio-imaged children's toy product (Calvaruso Decl., Ex. G at 213 [Briller Dep. 17:25-20:1]; Ex. I at 244 [Coacher Dep. 64:20-65:24]) and Hartz sought to capitalize on what it viewed as a world-wide phenomenon for the Rovio video game characters (Calvaruso Decl., Ex. G at 213 [Briller Dep. 66:14-18; 83:3-5; 108:14-17; 227:13-20]).  Mr. Voth acknowledged that the Rovio characters had a 90+% brand awareness meaning that over 9 in 10 consumers recognized the characters.  (Calvaruso Decl., Ex. K at 293 [Voth Dep. 73:11-74:18].)  In short, there is no evidence that Hartz ever sought to deceive consumers by palming off its Rovio-imaged product

---

[9] Hartz sold another $328,803 of products with plaintiff's artwork.  None of those were Angry Birds products as they used images of animals "Bill Bull," "Percival Platypus," "Cedric the Cat" and "Patch Monkey."  (Calvaruso Decl., Ex. P at 346.)

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

as Plaintiff's product, which is necessary to support an award of Hartz's profits on sales of Rovio-imaged products.

### ii.   Plaintiff has Made No Attempt to Demonstrate That Hartz's Sales Were Attributable to Plaintiff's Alleged Trademark

A plaintiff seeking a defendant's profits must demonstrate those profits that are "attributable to an infringement." Model Civ. Jury Instr. 9th Cir. 15.26 (2007). The Ninth Circuit has long recognized that sales of a product that infringe on a mark may be attributable to many factors aside from that mark. For example, in *Mattel, Inc. v. MGA Entertainment, Inc.* 616 F.3d 904 (9th Cir. 2010), the Ninth Circuit reversed an award of a constructive trust in favor of Mattel for the Bratz line of dolls, holding that "[e]ven assuming that . . . MGA [] misappropriated the names 'Bratz' and 'Jade,' the value of the trademarks the company eventually acquired for the entire Bratz line was significantly greater because of MGA's own development efforts, marketing and investment. *Id.* at 909; *see also Rolex Watch, U.S.A., Inc. v. Michel Co.*, 179 F.3d 704, 712 (9th Cir. 1999) (rejecting the recovery of the defendant's profits since "Rolex had not adequately demonstrated what portion of [defendant's] sales were attributable to altered 'Rolex' watches"); *Active Sports Lifestyle USA, LLC v. Old Navy, LLC,* No. SACV 12-572 JVS, 2014 WL 1246497 at *3 (C.D. Cal. Mar. 21, 2014) (Court refused to award plaintiff Old Navy's profits for the use of plaintiff's "ACTIVE" trademark since "a plaintiff must present evidence that directly ties consumer demand for the infringing product to the infringing feature." (citing *Apple Inc. v. Samsung Elec. Co. Ltd.*, 695 F.3d 1370, 1375 (Fed. Cir. 2012)).

To support a claim that plaintiff should be awarded every dollar of profits derived from Hartz's sale of Rovio imaged product, Plaintiff's damages expert merely performed a mathematical calculation of the total amount of profits that Hartz earned on the Rovio-imaged products. (Calvaruso Decl., Ex. K at 293 [Voth Dep. 162:17-163:6].) He made no effort to analyze what profits were attributable to the allegedly infringing trademark. Hartz's Rovio-imaged products are based upon the images of the popular video game that Mr. Voth

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

22

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

acknowledged was recognized by 90+% of the public.  (Calvaruso Decl., Ex. K at 293 [Voth Dep. 73:11-74:8].)  Mr. Voth acknowledged that consumers would likely attribute the term ANGRY BIRDS used on the Hartz product to the Rovio video game, rather than to the prior Juli Adams-imaged products that had no name recognition.  (Calvaruso Decl., Ex. K at 293 [Voth Dep. 164:9-12]).  Nevertheless, Mr. Voth testified that he did not attempt any "any allocation between consumers who purchased the product because they viewed ANGRY BIRDS as associated with the video games versus consumers who bought the product because they viewed ANGRY BIRDS as associated with the Juli Adams trademark.  (Calvaruso Decl., Ex. K at 293 [Voth Dep. 172:23-173:10].)  Indeed, the evidence is undisputed that Wal-Mart, the only large retailer to sell the Hartz Rovio-imaged product, purchased the product because the Wal-Mart buyer loved the Rovio video game.  (Calvaruso Decl., Ex. I at 244 [Coacher Dep. 234:2-19].)  Likewise, Mr. Voth acknowledged that Hartz significantly contributed to profits from the sale of Rovio-imaged products, as Hartz had to: (i) design the product, (ii) manufacture the proper quality such that consumers would want to purchase it and (iii) Hartz's sales force used its expertise to sell it to retailers, yet did not account for this in his damage calculation.  (Calvaruso Decl., Ex. K at 293 [Voth Dep. 157:8-158:11].)

In short, Plaintiff's failure to even attempt to demonstrate the amount of Hartz's profits attributable to the alleged infringement is sufficient grounds to dismiss Plaintiff's lost profits claim as a matter of law.

## IV.   CONCLUSION

Adams cannot demonstrate a material issue of fact establishing that: (i) Hartz breached the License Agreement; (ii) she now owns or ever owned any rights in the ANGRY BIRDS mark; or (iii) she is entitled to any damages based on any of the allegations set forth in her complaint.  For all of the foregoing reasons, the Court should dismiss all of Adams' claims with prejudice.

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

--

LANE POWELL PC

By   /s/ Andrea L. Calvaruso
    Jennifer Beyerlein, WSBA No. 35754
    beyerleinj@lanepowell.com
    Mark G. Beard, WSBA No. 11737
    beardm@lanepowell.com
    Carson Cooper, WSBA No. 44252
    cooperc@lanepowell.com

    Jonathan K. Cooperman
    Andrea L. Calvaruso
    Kelley Drye & Warren LLP
    101 Park Avenue
    New York, NY 10178-0062
    E-Mail: jcooperman@kelleydrye.com
    E-Mail: acalvaruso@kelleydrye.com

*Attorneys for Defendant The Hartz Mountain Corporation*

DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

24

## CERTIFICATE OF SERVICE

Pursuant to RCW 9.A.72.085, the undersigned certifies under penalty of perjury under the laws of the State of Washington and the Uanited States, that on the 6th day of October, 2015, the document attached hereto was presented to the Clerk of the Court for filing and uploading to the CM/ECF system.  In accordance with their ECF registration agreement and the Court's rules, the Clerk of the Court will send e-mail notification of such filing to the following persons:

| | |
|---|---|
| Anthony D. Shapiro<br>Hagens Berman Sobol Shapiro LLP<br>1918 Eighth Avenue, Suite 3300<br>Seattle, WA 98101-1244<br>Telephone: (206) 623-7292<br>Facsimile: (206) 623-0594<br>E-Mail: tony@hbsslaw.com | Simon B. Paris<br>Saltz Mongeluzzi, Barrett & Bendesky, PC<br>One Liberty Place, 52nd Floor<br>1650 Market Street<br>Philadelphia, PA 19103<br>Telephone: (215) 575-3985<br>E-Mail: sparis@smbb.com |
| Thomas E. Loeser<br>Hagens Berman Sobol Shapiro LLP<br>1918 Eighth Avenue, Suite 3300<br>Seattle, WA 98101-1244<br>Facsimile: (206) 623-0594<br>E-Mail: toml@hbsslaw.com | Patrick Howard<br>Saltz Mongeluzzi, Barrett & Bendesky, PC<br>One Liberty Place, 52nd Floor<br>1650 Market Street<br>Philadelphia, PA 19103<br>Telephone: (215) 575-3985<br>E-Mail: phoward@smbb.com |
| Daniel E. Gustafson<br>Gustafson Gluek PLLC<br>120 South 6th Street, Suite 2600<br>Minneapolis, MN 55402<br>Telephone: (612) 333-8844<br>E-Mail: dgustafson@gustafsongluek.com | Jonathan K. Cooperman *pro hac vice*<br>Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, NY 10178-0062<br>Telephone: (212) 808-7534<br>Facsimile: (212) 808-7897<br>E-Mail: jcooperman@kelleydrye.com |
| Andrea L. Calvaruso *pro hac vice*<br>Kelley Drye & Warren LLP<br>101 Park Avenue<br>New York, NY 10178-0062<br>Telephone: (212) 808-7853<br>Facsimile: (212) 808-7897<br>E-Mail: acalvaruso@kelleydrye.com | |

Executed on the 6th day of October, 2015, at Seattle, Washington.

Sara E. Foster
Sara E. Foster

LANE POWELL PC
1420 FIFTH AVENUE, SUITE 4200
P.O. BOX 91302
SEATTLE, WA 98111-9402
206.223.7000 FAX: 206.223.7107

DEFENDANT'S MOTION FOR SUMMARY
JUDGMENT

25