1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

HON. ROBERT S. LASNIK

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

JULI ADAMS,

                               Plaintiff,

    v.

THE HARTZ MOUNTAIN CORP.,

                            Defendant.

No. 2:14-cv-1174-RSL

**PLAINTIFF'S OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**NOTE ON MOTION CALENDAR:
October 30, 2015**

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

# TABLE OF CONTENTS

**Page**

I.    INTRODUCTION .................................................................................1

II.   COUNTER STATEMENT OF MATERIAL FACTS ........................................2

      A.    Juli Adams Created the "Angry Birds" and All Associated Intellectual
            Property.................................................................................2

      B.    The License Agreement ...........................................................4

      C.    The 'Angry Birds' Trademark ...................................................7

      D.    Hartz Dumps Juli's Angry Birds and Leverages Her Trademark against
            Rovio ....................................................................................9

III.  ARGUMENT ...................................................................................12

      A.    Standard of Review ...............................................................12

      B.    The Court Has Already Concluded that the Agreement is Not Ambiguous .........12

      C.    The Record Makes Clear that the Parties Intended the Agreement to
            License to Hartz Juli's Intellectual Property, Including the Angry Birds
            Mark ....................................................................................14

      D.    Hartz Misrepresents the Facts To Support Its Arguments .....................17

      E.    Juli Did Not Abandon Her Trademark of Angry Birds. .........................18

      F.    Juli Did Not Grant Hartz a Naked License ...................................19

      G.    Juli May Pursue Her Unjust Enrichment Claim ................................21

      H.    Hartz Deliberately Infringed Juli's Angry Birds Trademark ...................22

      I.    Hartz Ignores the Law on Trademark Damages ...............................23

IV.   CONCLUSION .................................................................................24



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

# TABLE OF AUTHORITIES

**Page(s)**

## CASES

*Adams v. Hartz Mt. Corp.,*
2014 U.S. Dist. LEXIS 173026 (W.D. Wash. Dec. 15, 2014)....................................12, 13, 20

*Arizona v. California,*
460 U.S. 605 (1983).........................................................................................................13

*Barcamerica Int'l USA Trust v. Tyfield Imps., Inc.,*
289 F.3d 589 (9th Cir. Cal. 2002)....................................................................................20

*Carradale Import Co. v. Pusser's, Ltd.,*
1991 U.S. App. LEXIS 7529 (9th Cir. Apr. 12, 1991) ......................................................17

*Competition Specialties Inc., v. Competition Specialties, Inc.,*
87 Fed. App'x 38 (9th Cir. 2004) ......................................................................................24

*Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East,*
542 F.2d 1053 (9th Cir. 1976) ..........................................................................................20

*Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.,*
778 F.3d 1059 (9th Cir. 2015) ..........................................................................................22

*Gorenstein Enters, Inc. v. Quality Care-USA, Inc.,*
874 F.2d 431 (7th Cir. 1989) ............................................................................................19

*Guerra v. Arctic Storm, Inc.,*
2004 U.S. Dist. LEXIS 24388 (W.D. Wash. Aug. 4, 2004) ..............................................12

*Hamilton-Brown Shoes Co. v. Wolf Bros. & Co.,*
240 U.S. 251 (1916).........................................................................................................24

*Hyytinen v. City of Bremerton,*
2014 Wash. App. LEXIS 3053 (Wash. Ct. App. Dec. 30, 2014) ...........................................21

*John C. Flood of Va., Inc. v. John C. Flood, Inc.,*
700 F. Supp. 2d 90 (D.D.C. 2010).....................................................................................20

*Maier Brewing Corp., v. Fleischmann Distilling Co.,*
390 F.2d 117 (9th Cir. 1968) ............................................................................................23

*Menalco v. Buchan,*
2010 U.S. Dist. LEXIS 8042 (D. Nev. Feb. 1, 2010) .......................................................22

*National Serv. Ass'n v. Capitol Bankers Life Ins. Co.,*
832 F. Supp. 227 (N.D. Ill. 1993) .....................................................................................22



*Peppers v. U. S. Cent. Credit Union*,
    199 F. Supp. 2d 1152 (D. Kan. 2002).............................................................18

*Partners for Health & Home, L.P. v. Seung Wee Yang*,
    2010 U.S. Dist. LEXIS 143476 (C.D. Cal. Sept. 13, 2010).........................19

*Royale Luau Resort, LLC v. Kennedy Funding, Inc.*,
    2008 U.S. Dist. LEXIS 11902 (D.N.J. Feb. 19, 2008) ...............................22

*San Diego Gas & Elec. Co. v. Canadian Hunter Mktg.*,
    132 F.3d 1303 (9th Cir. 1997) .....................................................................14

*Sheila's Shine Prods., Inc. v. Sheila Shine, Inc.*,
    486 F.2d 114 (5th Cir. 1973) .......................................................................20

*STX, Inc. v. Bauer USA*,
    1997 U.S. Dist. LEXIS 16250 (N.D. Cal. June 5, 1997) .............................19

*Travelodge Hotels, Inc. v. Elkins Motel Assocs.*,
    2005 U.S. Dist. LEXIS 24534 (D.N.J. Oct. 17, 2005)................................23

*United States Jaycees v. Philadelphia Jaycees*,
    639 F.2d 134 (3d Cir. 1981).........................................................................22

*Vigneri v. Point Pleasant Beach Bd. of Educ.*,
    2012 N.J. Super. Unpub. LEXIS 2670 (App. Div. Dec. 7, 2012)..............13

*VRG Corp. v. GKN Realty Corp.*,
    641 A.2d 519 (N.J. 1994).............................................................................22

*Young v. Young*,
    191 P.3d 1258 (Wash. 2008).......................................................................21

## OTHER AUTHORITIES

Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 18.20 ........................19



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

## I.   INTRODUCTION

In its Motion for Summary Judgment ("Motion"), Defendant Hartz Mountain Corp. claims as undisputed fact that its License Agreement with Juli Adams (the "Agreement") licensed only the drawings that were attached to the Agreement, nothing more, thus warranting summary judgment.  But the record before the Court belies every facet of this argument.  As an initial matter, the Court has already found as a matter of law that the Agreement is unambiguous in its coverage of *all* of Juli Adams' intellectual property.  Moreover, the Agreement was intended by its drafters to license all of Juli's intellectual property, specifically including "the entire Angry Birds concept, including its name, appearance, and finished design."  Hartz' motion must be denied because Hartz comes nowhere near its burden for the motion to be granted.

Testimony and documents establish: (1) Juli was *solely responsible* for the creation of the "Angry Birds," which were prototyped and packaged at the time she entered into the Agreement in November 2006; (2) during the licensing negotiations, Juli's representative, Todd Ripley (who Hartz elected not to depose in discovery) was clear that there was to be *no transfer of ownership* of any of Juli's intellectual property to Hartz; (3) after the Angry Birds video game was launched and its success soared, Hartz dumped Juli's Angry Birds, and immediately contacted Rovio seeking an exclusive licensing arrangement; (4) when Rovio rebuffed Hartz' advances, Hartz claimed Juli's "Angry Birds" trademark as its own, and threatened to re-launch Juli's Angry Birds to compete directly with Rovio; (5) Rovio, fearful of market confusion, believed Hartz had them "over a barrel" and ceded to Hartz' demands; (6) Hartz never informed Juli of the negotiations or license agreement with Rovio; and (7) after learning the foregoing, Juli notified Hartz of her claim of ownership of the trademark within one year and this lawsuit followed.

Most of these facts are not in dispute and preclude the summary judgment that Hartz seeks.  And for those facts that are in dispute, the jury must decide who to believe.  Juli has ample evidence to support her claims.[1]  Summary judgment must be denied.

---

[1] Hartz' Rule 12(b)(6) motion was only granted as to the New Jersey Conversion claim.  The remaining claims are: (i) breach of contract; (ii) breach of the covenant of good faith and fair dealing; (iii) unjust enrichment; (iv) declaratory judgment; (v) False Designation of Origin (Federally Registered Trademark Claim); (vi) False Designation of Origin (Common Law Trademark Claim); and (vii) accounting.



1    ## II.    COUNTER STATEMENT OF MATERIAL FACTS

2    **A.    Juli Adams Created the "Angry Birds" and All Associated Intellectual Property**

3    Juli Adams is an artist and sculptor from Seattle, Washington. [2] In mid-July 2006, Juli,

4    and her then boyfriend Todd Ripley, met Hartz' then Director of Marketing for Pet Accessories,

5    Tim Ford, at an art show in Kalispell, Montana.[3]  Ford, who had been walking through the show

6    looking to develop a "unique" "pet specialty line," came upon Adams' booth while Ripley was

7    manning it and was immediately impressed by Juli's distinctive characters and style.[4]  Ford

8    returned to the booth and, after a short conversation, asked Juli if she would be willing to work

9    on designing cat and dog toys for Hartz.[5]  Ford left her his business card and promised to call.[6]

10    Ford telephoned Juli after he returned to his office in New Jersey, confirmed she wanted

11    to design pet toys for Hartz, and told her that he wanted her to "create some categories of

12    product[s]."  Ford stressed that Juli should "be creative" and that Harz was looking for

13    something "very unique."[7]  After the call, Juli was excited and began designing.[8]  Within ten

14    days, Juli provided Ford with initial character designs, including a line of cat toys Juli named the

15    "Angry Birds."[9]  Ford requested Juli color out the pencil sketches so they could be sent to China

16    for a first rendition of prototypes.[10]

17    Hartz' former brand manager for toys and accessories, Scott Yacovino, described Juli's

18    cat toys, "the Angry Birds line,"[11] as "angry because cats were trying to eat them.  That was the

19    concept in Juli's universe."[12]  "The entire concept of Angry Birds … c[a]me from Juli Adams,"

20

21

22

23    [2] *See* Declaration of Anthony D. Shapiro In Support of Plaintiff's Opposition to Defendant's Motion for
Summary Judgment ("Shapiro Decl."), Ex. 1 (Adams Dep. 9-10); Ex. 2 (Decl. of Todd Ripley ("Ripley Decl."), ¶
2).

24    [3] *Id.*, Ex. 3 (Ford Dep. 157:9-158:10); Ex. 1 (Adams Dep. 48:23-49:3).
[4] *Id.*, Ex. 3 (Ford Dep. 158-160).

25    [5] *Id.*, Ex. 3 (Ford Dep. 160:18-24).
[6] *Id.*, Ex. 3 (Ford Dep. 160-161:23-5).

26    [7] *Id.*, Ex. 3 (Ford Dep. 161:15-20, 162:2-9, 164:21-22); Ex. 2 (Adams Dep. 56:20-23, 57:20-22).
[8] *Id.*, Ex. 1 (Adams Dep. 58:2, 8-9); *see also* Ex. 2 (Ripley Decl., ¶ 3).

27    [9] *Id.*, Ex. 3 (Ford Dep. 165:10-13); Ex. 2 (Ripley Decl., ¶¶ 3-4).
[10] *Id.*, Ex.3 (Ford Dep. 166:6-8).

28    [11] *Id.*, Ex. 4 (Yacovino Dep. 64:10-13); Ex. 2 (Ripley Decl., ¶¶ 4-5).
[12] *Id.*

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   "the artwork, and the characters and their back story … [t]hat was [Juli's] vision."[13]  And, *Juli*

2   *provided Hartz with the phrase* "Angry Birds."[14]  It was Hartz' intention to "leverage" Juli's

3   work as an "innovative artist" and to "celebrate Juli with the product line to differentiate it from

4   the open markets goods that were available."[15]  Yacovino described Juli's work as "ownable,"

5   "distinct" and "unique designs that only [Juli] would have created in [her] head."[16]  Hartz'

6   marketing team believed, at the time, that Juli's Angry Birds could be "a franchise" for Hartz.[17]

7       Within weeks of Juli and Ford's initial meeting, Hartz' Chinese manufacturer, Eden

8   Toys, sent pictures of the prototypes of Juli's Angry Birds.[18]  Then, in late October/early

9   November 2006, Hartz flew Juli to its New Jersey headquarters to do a meet and greet,[19] review

10  and provide feedback on the Angry Birds prototypes, and create background stories for each

11  character.[20]  Juli had "lot[s] of design changes" to the prototypes and wanted to make sure they

12  resembled her artwork.[21]  After Juli finished her design changes, "the Angry Birds did not evolve

13  all that much" with the exception of "minor tweaks."[22]  Yacovino explained that he would

14  contact Juli to discuss the line because they had certain "checkpoints" and that he would call on

15  her when he needed her "dig into something."[23]

16      In addition to designing the toys themselves, Hartz wanted Juli's "thumbprint" on the

17  packaging.[24]  Juli provided artwork for the Angry Birds packaging, including the background

18  coloring and design, certain animal renditions, as well as an original story for all the characters.[25]

19

20

21      [13] *Id.*, Ex. 4 (Yacovino Dep. 193:17-18); *see also* Ex. 3 (Ford Dep. 223:7-10) ("Juli was the one that did the branding, came up with the character names. [Hartz] used … her stuff and then we tried to make sure that we could trademark them."); *see also* Ex. 4 (Ripley Decl., ¶¶ 5-6).

22      [14] *Id.*, Ex. 4 (Yacovino Dep. 67:9-10, 185:10-14); *see also* Ex. 2 (Ripley Decl., ¶¶ 3-5).
        [15] *Id.*, Ex. 4 (Yacovino Dep. 68:8-15).

23      [16] *Id.*, Ex. 4 (Yacovino Dep. 166:19-24).
        [17] *Id.*, Ex. 4 (Yacovino Dep. 164:25-165:5); *see also* Ex. 5 (HARTZ018466-467).

24      [18] *Id.*, Ex. 6 (HARTZ018658).
        [19] *Id.*, Ex. 4 (Yacovino Dep. 70:9-14).

25      [20] *Id.*, Ex. 1 (Adams Dep. 62-63, 64:17-21, 68:25-69:6); *see also* Ex. 2 (Ripley Decl., ¶ 13).
        [21] *Id.*, Ex. 1 (Adams Dep. 65:5-21, 152:19-153:2 ("I made notations on the overall look of the toy, what I

26  thought needed to be changed, and then they would send them back and redo them…. And then they would show me again.  And then I would give approval….").

27      [22] *Id.*, Ex. 4 (Yacovino Dep. 199:23-200:1); *see also* Ex. 2 (Ripley Decl., ¶ 14).
        [23] *Id.*, Ex. 4 (Yacovino Dep. 180:12-15, 179:8-9).

28      [24] *Id.*, Ex. 1 (Adams Dep. 155:2-11).
        [25] *Id.*, Ex. 4 (Yacovino Dep. 132-134); *see also* Ex. 1 (Adams Dep. 155:12-20).



1    As Yacovino admitted, Hartz "leveraged" all of Juli's work.[26]

2          After the New Jersey meeting, Hartz was excited about Juli's toy line.  Indeed, Hartz'

3    Senior Director of Marketing, Kimberly Cassar, emailed Juli on November 8, 2006, stating "it

4    was so nice to meet you during your visit to the Hartz offices" and that Hartz was "excited about

5    the products [she was] working on with Tim [Ford]."[27]  Cassar told Juli that she had her "eye on

6    a bunch of the cat toys that [she] want[ed] to take home to [her] cat!"[28]  By November 22, 2006,

7    Hartz had assigned Juli's Angry Birds a UPC code, they were unveiled to Hartz' sales team, and

8    sales forecasting was underway in preparation for marketing and launch.[29]

9    **B.    The License Agreement**

10          Simultaneous with Juli's design of the Angry Birds was the negotiation of the

11    Agreement.  There were four participants in the negotiation: (1) Juli; (2) Juli's long-time

12    boyfriend, Todd Ripley, who handled the discussion for Juli;[30] (3) Hartz' Director of Marketing,

13    Tim Ford; and (4) Hartz' General Counsel, Max Marx.[31]  Marx's role was to draft the agreement

14    according to the parameters sought by Ford and agreed to by Juli.  All business related decisions

15    were to come from Tim Ford, who Marx described as "the client."[32]  Hartz' objective was not to

16    have to pay Juli any up-front royalties, what Ford described as "a deal with no cash."[33]

17          Juli's motivation, on the other hand, guided by Todd Ripley, was to structure an

18    agreement much like a professional athlete:  Juli was willing to take a low royalty for an initial

19    term to prove her worth, and then require Hartz to reopen negotiations at the end of the initial

20    term, once Juli's value had been established.[34]  A critical element of Ripley's strategy for Juli

21    was that Juli would retain all ownership of everything she provided to Hartz, including the

22

23

---

24    [26] *Id.*, Ex. 4 (Yacovino Dep. 134:9); *see also* Ex. 2 (Ripley Decl., ¶¶ 5-6).
    [27] *Id.*, Ex. 7 (HARTZ019186).
    [28] *Id.*

25    [29] *Id.*, Ex. 8 (HARTZ019204-206); *see also* Ex. 4 (Yacovino Dep. 81:2-9, 81:22-82:7).
    [30] Ripley had graduated from Gonzaga Law School and had practiced law for two years, but was not practicing

26    law at the time of the negotiation of the Agreement.  *Id.*, Ex. 1 (Adams Dep. 83-84:20-6); *see also* Ex. 2 (Ripley
Decl., ¶¶ 1, 7-19).

27    [31] *Id.*, Ex. 3 (Ford Dep. 202:1-7); *see also* Ex. 4 (Yacovino Dep. 69:3-9).
    [32] *Id.*, Ex. 9 (Marx Dep. 145:13-146:5).
    [33] *Id.*, Ex. 3 (Ford Dep. 204:13-17).

28    [34] *Id.*, Ex. 2 (Ripley Decl., ¶ 8).



1  designs and associated intellectual property, including the name of Juli's cat toys, "Angry

2  Birds."[35]

3       Hartz initially sent Juli a "Pet Toy Product Design Royalty Agreement" dated August 14,

4  2006,[36] that stated Juli "acknowledge[s] and agree[s] that [she] participated in the design of

5  various pet toys [for Hartz]."[37]  In exchange for a running royalty equal to 2% of Net Sales,

6  Hartz would have complete ownership of all of Juli's work,[38] and Juli would transfer to Hartz,

7  "all right, title and interest in and to the Products."[39]  Juli rejected these terms.[40]

8       On August 23, 2006, Hartz sent a new agreement, titled "Confidential Exclusive License

9  Agreement."[41]  Hartz again sought ownership of Juli's work.[42]  This time, Hartz included a

10  clause that after Hartz paid the running royalty over the term of the agreement, "Hartz shall have

11  a perpetual exclusive right to use the Intellectual Property on a royalty free basis…."[43]

12       On August 28, 2006, Ripley sent a revised Agreement to Hartz.[44]  Ripley removed the

13  language transferring ownership to Hartz.  Ripley noted in separate comments that "some of the

14  prototypes that Juli has created for this project are similar to those that are already in her artwork

15  that Juli sells …" and that "Juli intends that this licensing agreement *not* be deemed fully paid

16  after five years of royalty payments … [and] Hartz will *not* own any of Juli's intellectual

17  property that was licensed during the five year contract period."[45]  Ripley gave clear instructions

18  of his intent to Marx:  he told Marx that Juli would never agree that Hartz would own her

19  intellectual property.[46]  He instructed Marx that "if Hartz wanted to use anything that Juli

20  provided Hartz after the expiration of the five year term, Hartz was going to have to renegotiate

21

22

---

23  [35] *See id.*
   [36] *Id.*, Ex. 10 (HARTZ00108-112).
   [37] *Id.*, Ex. 10 (HARTZ000108).
24  [38] *Id.* ("Hartz has the exclusive ownership in the work product resulting from your efforts."); *see also* Ex. 2 (Ripley Decl., ¶ 9).
25  [39] *Id.*
   [40] *Id.*, Ex. 2 (Ripley Decl., ¶ 9).
26  [41] *Id.*, Ex. 11 (HARTZ000113-122).
   [42] *Id.*, Ex. 2 (Ripley Decl., ¶ 10).
27  [43] *Id.*, Ex. 11(*see generally*, § 2.1, § 4.1, § 5.1)
   [44] *Id.*, Ex. 2 (Ripley Decl., ¶ 12).
28  [45] *Id.*, Ex. 11 (HARTZ000122) (emphasis added).
   [46] *Id.*, Ex. 2 (Ripley Decl., ¶ 11).

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    at the end of the five-year term to pay for it."[47]  In the course of the negotiation, Ripley reduced

2    the royalty rate from 4% to 2.5% of net sales[48] because Juli was "willing to take a lesser royalty

3    in order to maintain [her] intellectual property rights[.]"[49]

4            On September 1, 2006, Hartz responded to Ripley's changes by accepting most of them,

5    including that after five years, Hartz would not own Juli's work, and the decreased 2.5%

6    royalty.[50]  On November 20, 2006, Hartz made additional edits to the Agreement.  Importantly,

7    in Article Eight, titled "Intellectual Property Ownership Rules," which states that "each party

8    acknowledges that *no* transfer of ownership of or a license to any intellectual property is

9    contemplated by this Agreement, except as provided herein," Hartz added the language that it

10   "shall have the right to file copyright and other intellectual property filings in its discretion, for

11   all the Licensed Products."[51]  Ripley reviewed the Agreement carefully, including the definition

12   of the intellectual property that was being licensed.  Ripley understood and intended that the

13   license agreement covered everything Juli provided to Hartz.[52]  Ripley did not intend or

14   understand that the license was in any way limited to only the drawings that were attached to it.[53]

15   Both Juli and Hartz agreed to the terms and executed the Agreement on November 20, 2006.[54]

16           Although the Angry Birds designs and prototypes were done prior to signing the

17   Agreement,[55] the various draft Agreements did not specifically reference any of Juli's toys.

18   Instead, the Agreement always referred to "*all* intellectual property of Juli Adams licensed under

19   this Agreement."[56]  Ripley intended and understood that language made the license as broad as

20   possible and inclusive of "the entire Angry Birds concept, including its name, appearance, and

21   finished design."[57]  Although the definition of "Licensed Products" in the Agreement references

22

23   _____
     [47] *Id.*
24   [48] *Id.*, Ex. 11 (HARTZ000120).
     [49] *Id.*, Ex. 1 (Adams Dep. 130:20-24).
25   [50] *Id.*, Ex. 12 (HARTZ000099-108).
     [51] *Id.*, Ex. 13 (HARTZ000081-89).
26   [52] *Id.*, Ex. 2 (Ripley Decl., ¶¶ 16-17).
     [53] *See id.*
27   [54] *Id.*, Ex. 14 (Dkt. No. 1, Ex. A).
     [55] *Id.*, Ex. 2 (Ripley Decl., ¶ 18).
28   [56] *Id.*, Ex. 14 (Dkt. No. 1, Ex. A, ¶ 1.8).
     [57] *Id.*, Ex. 2 (Ripley Decl., ¶ 18).

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   "the products set forth on <u>Exhibit A</u> attached hereto and made an integral part hereof,"[58] Hartz

2   admits it failed to attach an Exhibit A.[59]  Ripley states the "Angry Birds toys were among the

3   Licensed Products discussed in the Agreement."[60]

4       Tim Ford, Hartz' "client" who was driving the intent of Hartz during the license

5   negotiation, described the intent of the final Agreement:

6         "We agreed [Juli] retained th[e] rights to any trademarks, brands, looks, logos,
        background, anything to do with [her] art.  And [Hartz] did that so that [it] [did

7         not] have to pay [her] anything up front.  Do all this stuff for [Hartz].  We
        don't want to pay you.  We'll only pay you a 2.5 percent royalty which was

8         probably the smallest royalty Hartz had.[61]

9   **C.**    **The 'Angry Birds' Trademark**

10       Ford resigned from Hartz on January 30, 2007, to become CEO of Sherpa Pet Group

11   following a dispute over his compensation.[62]  Finalizing and launching Juli's Angry Birds line

12   for Hartz became the responsibility of Scott Yacovino.[63]  Yacovino testified he was not

13   "involved in the creation of the [Hartz/Adams] deal from a legal standpoint" nor had he ever

14   seen the Agreement.[64]

15       It was not Hartz' practice to trademark every toy line it launched; it was only when Hartz

16   had a specific product line that it wanted to protect that it would seek a trademark.[65]  But it was

17   Hartz' practice to file the trademarks for the products it was licensing.[66]  Hartz intended Juli's

18   Angry Birds to be sold exclusively in the "pet specialty class of trade," and not big retailers like

19   Wal-Mart, Target, and Walgreens.[67]  And, although Hartz had begun marketing the Angry Birds

20   line in January 2007 to its "pet specialty" customers like Pet Smart,[68] before it could begin sales

21   Hartz encountered "a few trademark issues with product names...."[69]

22

23      [58] *Id.*, Ex. 14 (Dkt. No. 1, Ex. A, ¶ 1.9) (underline in original).
      [59] *Id.*, Ex. 15 (Def's. April 27, 2015 Responses and Objections to Pls. First Request for Admission, No. 18).
24      [60] *Id.*, Ex. 2 (Ripley Decl., ¶ 18).
      [61] *Id.*, Ex. 3 (Ford Dep. 231:15-232:3).
25      [62] *Id.*, Ex. 3 (Ford Dep. 405-408).
      [63] *Id.*, Ex. 4 (Yacovino Dep. 99:1-17); *see also* Ex. 16 (HARTZ018563).
26      [64] *Id.*, Ex. 4 (Yacovino Dep. 15:3; 69:20-22).
      [65] *Id.*, Ex. 4 (Yacovino Dep. 54:6-12; 55:5-14).
27      [66] *Id.*, Ex. 9 (Marx Dep. 137:8-18).
      [67] *Id.*, Ex. 4 (Yacovino Dep. 114:3-25).
28      [68] *Id.*, Ex. 17 (HARTZ018309-312).
      [69] *Id.*, Ex. 18 (HARTZ018374).



1    Hartz consulted with Juli regarding the trademarking of her work. On February 20, 2007,

2    Yacovino emailed Juli and requested a conference call to discuss the "trademark issues."[70] Each

3    Angry Bird that Juli designed (Angry Hummer, Angry Roster, etc.) had an individual name,

4    which in addition to trademarking "Angry Birds," Hartz intended to specifically trademark.[71]

5    Hartz told Juli that the initial set of names proved difficult to trademark.[72] Hartz requested Juli

6    create new names for the characters, which she did, ultimately resolving the trademark issue.[73]

7        On March 28, 2007, more than four months after the Agreement was signed and Juli's

8    Angry Birds line was fully developed, Hartz simultaneously filed applications with the Patent

9    and Trademark Office for "The Juli Adams Collection"[74] and "Angry Birds."[75] Without

10   explanation, and after it already filed the trademark applications, on May 22, 2007, Hartz

11   requested Juli sign "Amendment Number 1" to the Agreement. The Amendment purported to

12   grant Hartz the "right to file copyright, trademark, and other intellectual property right filings in

13   Hartz' name, in its discretion, for all Licensed Products."[76] While redundant of the rights already

14   granted in Article Eight of the Agreement, the Amendment did *not* alter ownership of the

15   intellectual property.[77] Todd Ripley recalls that "there was no special payment or anything else

16   given to Juli that would qualify as 'consideration' for that amendment."[78]

17       On June 11, 2007, also without any payment or other consideration, Hartz sent Juli a

18   "Copyright Assignment" which granted Hartz ownership rights over copyright materials

19   "annexed as Exhibit A" to that Assignment.[79] However, Hartz never attached an Exhibit A, or

20   anything else to the Assignment, making it is impossible to know what materials, if any, were

21

22

23

24       [70] *Id.*, Ex. 19 (HARTZ018746-748); *see also* Ex. 4 (Yacovino Dep. 126-127:9-8).
         [71] *Id.*, Ex. 4 (Yacovino Dep. 116:4-6).

25       [72] *Id.*, Ex. 4 (Yacovino Dep. 127:15-18).
         [73] *Id.*, Ex. 4 (Yacovino 128:2-18, HARTZ018746).

26       [74] *Id.*, Ex. 20 (HARTZ050002-08).
         [75] *Id.*, Ex. 21 (HARTZ049935-941).

27       [76] *Id.*, Ex. 22 (HARTZ000167-168).
         [77] *Id.*, Ex. 9 (Marx Dep. 190:4-191:15).

28       [78] *Id.*, Ex. 2 (Ripley Decl., ¶ 2).
         [79] *Id.*, Ex. 23 (HARTZ000124); Ex. 9 (Marx 212:14-18; 213:3-6).

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    assigned.[80]  Moreover, Hartz has never contended that assignment has any bearing on the issues

2    in this case.[81]

3            On July 10, 2007, the Trademark Office requested information related to the proposed

4    Angry Birds mark, stating "[t]he nature of the goods is not clear" and requested samples or

5    photographs and a description of the nature, purpose and channels of trade for the trademark.[82]

6    In response, on July 18, 2007, Hartz submitted a photograph of Juli's "Angry Birds – Parrot" in

7    its packaging and advised that "the goods are plush toys for cats in the form of cartoon like

8    birds."[83]  The Angry Birds trademark was approved by the Trademark Office and Hartz began

9    the sale of Juli's Angry Birds.[84]

10   **D.      Hartz Dumps Juli's Angry Birds and Leverages Her Trademark Against Rovio**

11           On December 11, 2009, Finish video game creator, Rovio Entertainment, launched the

12   "Angry Birds" video game.[85]  As of January 2011, Angry Birds had been downloaded 100

13   million times internationally and was the top mobile game in the world.[86]  On February 15, 2011,

14   Hartz sent Juli her last royalty check for $40.66 for the fourth quarter of 2010 and discontinued

15   the sales of her Angry Birds.[87]  Hartz told Juli nothing of its intentions with respect to Rovio or

16   Juli's Angry Birds trademark.  But internally, Hartz wanted to "[d]etermine how to properly

17   leverage [its] current ® on Angry Birds in all pet products."[88]

18           Eight days after mailing Juli her last check, and while the Agreement was still in force,

19   on February 23, 2011, Hartz' Associate Category Manager, Irina Briller, sent an email to Rovio,

20   "I am interested in licensing the angry birds image in order to create a product line.  I would like

21   to discuss this matter with you at your earliest convenience."[89]  Rovio had *no interest* in entering

22

23   _____

     [80] *Id.*

24   [81] Hartz also had Juli execute a "Consent to Register Name," which was required by the Trademark Office in
     order to register "The Juli Adams Collection."  *See id.*, Ex. 42 (HARTZ049986).

25   [82] *Id.*, Ex. 24 (HARTZ049928-929).
     [83] *Id.*, Ex. 25 (HARTZ049926-927).

26   [84] *Id.*, Ex. 26 (HARTZ049901-908).
     [85] *Id.*, Ex. 27 (https://en.wikipedia.org/wiki/Angry_Birds_(video_game)) (last visited October 23, 2015).

27   [86] *Id.*, Ex. 28 (HARTZ000915-923).
     [87] *Id.*, Ex. 29 (HARTZ000001).

28   [88] *Id.*, Ex. 30 (HARTZ000923).
     [89] *Id.*, Ex. 31 (HARTZ000911).



the pet toy market with its Angry Birds and had rejected other companies' similar advances.[90]

Rovio was "very particular over … what types of items were licensed."[91]

Nonetheless, Rovio's American licensing agent, Marc Mostman, agreed to schedule a conference call with Hartz on February 28, 2011, to discuss Hartz' proposal.[92]  During the call, Mostman informed Hartz that Rovio was *not likely* to be interested in creating an Angry Birds line of pet toys, "but if [Hartz] could put down a proposal and get [him] the terms … [he] would forward it to Rovio and discuss it with them…."[93]  Hartz' proposal to Rovio offered a 2% royalty on the sale of Rovio's Angry Birds pet toys in the U.S., Canada, and U.K, with a minimum guarantee of $15,000 in the first year, $20,000 in the second and $25,000 in the third.[94]  Rovio was insulted by the offer; and thought it must have been a mistake.[95]  Mostman followed up with Hartz and Hartz' responded unequivocally, "the 2% royalty rate we offered was not a mistake."[96]  Hartz claimed it solely owned the Angry Birds trademark for pet toys and told Mostman if Rovio was not interested in doing a deal, Hartz would re-release it's Angry Birds to compete against Rovio.  Hartz even sent Rovio photographs of Juli's Angry Birds, calling them "our Angry Birds."  Hartz wrote to Mostman:

> I am not sure if you are aware of the fact that Hartz registered the Angry Birds trademark in July 2008 for the pet toys category, over a year before the Angry Birds game was released as an app in Apple's App Store in December 2009.  I am enclosing some photos of a selection of *our Angry Birds* toys, which we commenced selling in January, 2008.  Our intention is to move forward with our line of products *for which we own the trademark*, but we would prefer to collaborate with Rovio as we move forward.  If we do so, we can assure that our Angry Birds pet toys complement Rovio's equity instead of compete against it.  Additionally, it must be said that *given our ownership of the trademark in pet toys*, Rovio does have some obvious legal limitations on licensing other manufacturers for this category.[97]

---

[90] *Id.*, Ex. 32 (Mostman Dep. 19-20:20-13).
[91] *Id.*, Ex. 32 (Mostman Dep. 28:23-24).
[92] *Id.*, Ex. 32 (Mostman Dep. 18:5-13).
[93] *Id.*, Ex. 32 (Mostman Dep. 21:21-22:2).
[94] *Id.*, Ex. 32 (Mostman Dep. 22:16-24).
[95] *Id.*, Ex. 32 (Mostman Dep. 23:2-10).
[96] *Id.*, Ex. 33 (HARTZ002314).
[97] *Id.*, Ex. 33 (HARTZ002314) (emphasis added).

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

Rovio was concerned by Hartz' overtures and did not want confusion in the marketplace between its Angry Birds and other similar products.[98]  Hartz exerted pressure on Rovio setting an April 15, 2011 deadline to decide or Hartz would go forward on its own using "our Angry Birds."[99]  Negotiation continued, with Hartz upping its royalty offer to 10%, and setting a new deadline of April 25, 2011, and making clear that "if we have not reached an agreement at that time, we will pursue our version of Angry Birds for the 2011 holiday season and beyond."[100] Rovio understood the risk and the pressure, and did not believe Hartz' "strict deadlines and ultimatums" "were the start of a great partnership,"[101] but ultimately Rovio believed Hartz had them "over a barrel."[102]

Internally, Hartz was preparing to launch either with Rovio-themed or Juli's Angry Birds, referred to as Plan A and Plan B.  Hartz understood that "that the financials would be different for each scenario."[103]  Hartz assigned Irina Briller to prepare a profit and loss statement for each line of Angry Birds, recognizing that "Plan A is certainly going to get more distribution than Plan B."[104]

Ultimately, Rovio capitulated and the parties entered into a five-year agreement on May 13, 2011.[105]  It was recognized as "one of the biggest events that ha[d] happened at Hartz in years"[106] and it was "the highest priority product in the company line" at the time.[107]  Hartz announced its deal with Rovio on November 17, 2011, and went on to earn millions selling Angry Birds pet toys,[108] but never paid another cent to Juli Adams.  Scott Yacovino testified that after he left the employ of Hartz and became aware of Rovio's game, he thought Rovio's birds were "pretty similar" to Juli's; "close in terms of color palette;" Rovio's designs "weren't that far away from Juli's designs" and had "a similar concept … Juli's birds were angry, the cats chasing

---

[98] *Id.*, Ex. 32 (Mostman Dep. 26:20-25).
[99] *Id.*, Ex. 32 (Mostman Dep. 36:2-10); Ex. 33 (HARTZ002314).
[100] *Id.*, Ex. 34 (HARTZ002575).
[101] *Id.*, Ex. 35 (STRIKER000109).
[102] *Id.*, Ex. 32 (Mostman Dep. 42:17-43:16).
[103] *Id.*, Ex. 36 (HARTZ002548).
[104] *Id.*, Ex. 37 (HARTZ010202-207); Ex. 36 (HARTZ002548).
[105] *Id.*, Ex. 38 (HARTZ000170-175).
[106] *Id.*, Ex. 39 (HARTZ002716).
[107] *Id.*, Ex. 40 (HARTZ003839).
[108] *Id.*, Ex. 48 (July 8, 2015 Expert Report of Drew E. Voth) (subject to motion to seal).

PLAINTIFF'S OPP. TO MOT. FOR SUMM. JUDGMENT - 11
Case No. 14-cv-01174-RSL
005029-11 824808 V1

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1    them, and this was the same concept [from Rovio]."[109]

2          It is undisputed that Juli's Agreement with Hartz was still in effect during the Rovio

3    negotiations.[110]  It is undisputed that Hartz never contacted Juli to discuss any of the terms

4    regarding the use of the trademark, the re-launch of her product, or the Rovio agreement.  It is

5    undisputed that Hartz did not seek to extend the License Agreement or buy out Juli, though it had

6    the right to do both under the Agreement.[111]  The License Agreement expired in 2013 and, per its

7    terms, all of the intellectual property Juli licensed to Hartz, and the associated rights, reverted to

8    Juli.[112]  Juli put Hartz on notice of her claim of ownership of the trademark on January 23, 2014,

9    approximately one year after the Agreement expired.[113]

10                           **III.     ARGUMENT**

11    **A.     Standard of Review**

12          Summary judgment motions may be granted *only* if the evidence shows that there is no

13    genuine issue as to any material fact and that the moving party is entitled to a judgment as a

14    matter of law.  *Guerra v. Arctic Storm, Inc.*, 2004 U.S. Dist. LEXIS 24388, at *3-4 (W.D. Wash.

15    Aug. 4, 2004) (*citing* Fed. R. Civ. P. 56(c)).  "In ruling on a motion for summary judgment, the

16    evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in

17    [her] favor."  *Id*. (*quoting Orsini v. O/S Seabrooke O.N.*, 247 F.3d 953, 958 (9th Cir. 2001)

18    (*citing Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 255 (1986)).  The moving party bears the

19    burden of demonstrating that "there is an absence of evidence to support the non-moving party's

20    case."  *Id*. (*quoting Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986)).  Here, there are material

21    issues of fact that must be resolved by a jury before Hartz is entitled to judgment.

22    **B.     The Court Has Already Concluded that the Agreement is Not Ambiguous**

23          Hartz' summary judgment motion seeks to re-litigate an issue that has already been

24    decided by this Court:  the meaning of the word "including" in the License Agreement.  Def. Brf.

25    at 8.  In ruling on Hartz' Rule 12(b)(6) motion, the Court held that under New Jersey law,

---

26

27

28

[109] *Id*., Ex. 4 (Yacovino Dep. 206-207).
[110] *Id*., Ex. 15 (Def's. Objs. And Responses to Pls. First Set of Request For Admissions, No. 9).
[111] *Id*., Ex. 15 (Def's. Objs. And Responses to Pls. First Set of Request For Admissions, Nos. 14-15).
[112] *Id*., Ex. 14 (Dkt. No 1, Ex A, Art. 8).
[113] *Id*., Ex. 41 (Jan. 23, 2014 J. Hanamirian, Esq. Ltr. to Hartz).



1    "Questions of contract interpretation are matters of law to be decided by the Court." *Adams v.*

2    *Hartz Mt. Corp.*, 2014 U.S. Dist. LEXIS 173026, at *5-6 (W.D. Wash. Dec. 15, 2014) (*citing*

3    *Kieffer v. Best Buy*, 14 A.3d 737, 742 (N.J. 2011)).  The Court continued, "[t]he judicial task is

4    simply interpretative; it is not to rewrite a contract for the parties better than or different from the

5    one they wrote for themselves." *Id.* (*citing Kieffer*, 14 A.3d at 743).  The Court "should give

6    contractual terms 'their plain and ordinary meaning,' unless specialized language is used peculiar

7    to a particular trade, profession, or industry." *Id.* (citations omitted).

8         Through this prism, the Court analyzed the word "including" in the Agreement's

9    definition of "Intellectual Property," which reads "all intellectual property of Juli Adams

10   licensed under this Agreement *including* (a) the intellectual property attached hereto as Appendix

11   B and (b) such future intellectual property of Juli Adams…." *Id.* (emphasis added).  The Court

12   *did not* find the term "including" ambiguous requiring parol evidence, but instead applied "the

13   ordinary meaning" – as the case law directs. *Vigneri v. Point Pleasant Beach Bd. of Educ.*, 2012

14   N.J. Super. Unpub. LEXIS 2670, at *5 (App. Div. Dec. 7, 2012) ("Resorting to parol evidence is

15   improper where, as here, the … contracts are clear and unambiguous.").  The Court then

16   *concluded as a matter of law* that the definition "makes it clear that the term 'including' does not

17   mean that *only* the [Plaintiff's] drawings in Appendix B could be part of the Intellectual

18   Property.  Rather, those drawings were just part of what could be Plaintiff's Intellectual

19   Property." *Adams*, 2014 U.S. Dist. LEXIS 173026 at *10-11 (emphasis in original).  Nothing

20   has changed since this holding; and it is the law of this case. *Arizona v. California*, 460 U.S.

21   605, 618 (1983) ("when a court decides upon a rule of law, that decision should continue to

22   govern the same issues in subsequent stages in the same case.").

23        Nonetheless, Hartz maintains that the use of the word "including" was to limit the

24   definition of Intellectual Property to just the items listed in the succeeding (a) and (b).

25   Hartz claims that the language is "precise," does not expand the definition of Intellectual

26   Property, and that it would be "hard" to replace the word "including" with any other word.  Def.

27   Brf. at 8.  Hartz also claims that Plaintiff is improperly reading into the Agreement the phrase

28   "but not limited to." *Id.*  Hartz is wrong on each point.



1      *First*, if Hartz, at the time of drafting, intended to strictly limit the definition of

2  Intellectual Property to the attached items, it would have been simple:  Hartz could have used

3  any number of phrases to accomplish its claimed intent.  Just one example would be "which is"

4  as opposed to "including":  "all intellectual property of Juli Adams licensed under this

5  Agreement, **[which is]** (a) the intellectual property attached hereto as Appendix B and (b) such

6  future intellectual property of Juli Adams" that is added by amendment.[114]  The use of

7  "including" and not "which is" or another like construction demonstrates Hartz had *no* intention

8  of limiting the intellectual property covered by the Agreement; it wanted to capture all of

9  Adams' intellectual property.[115]  Indeed, Hartz' brand manager testified that the plan was to

10  "leverage" *all* of Juli's work.[116]  Its present arguments betray merely a *post hoc* litigation

11  strategy.

12      *Second*, it is Hartz – not Juli – who is trying to add a phrase into the definition of

13  Intellectual Property.  Def. Brf. at 8.  Hartz wants the Court to interpret the word "including" to

14  mean "limited to."  But, the Court already concluded that the plain definition of "including"

15  "makes it clear that … [it] does not mean that only the [Plaintiff's] drawings in Appendix B

16  could be part of the Intellectual Property.  Rather, those drawings were just part of what could be

17  Plaintiff's Intellectual Property."  *Id*. (emphasis in original).  Hartz' request for summary

18  judgment thus implicitly couches a thinly veiled motion for reconsideration that should be

19  denied.[117]

20  **C.**    **The Record Makes Clear that the Parties Intended the Agreement to License to Hartz All of Juli's Intellectual Property, Including the Angry Birds Mark**

21

22      Determining the intent of the parties to the Agreement requires inquiry of four persons'

23  intent:  Juli Adams; her counterpart at Hartz, Tim Ford; Hartz' attorney, Max Marx; and Juli

---

24  [114] Likewise, Hartz could have simply used "limited to."

25  [115] Moreover, as explained *infra*, in Section III(C), both Hartz' agent (Tim Ford) and Juli's agent (Todd Ripley) state unequivocally that the mutual intent was that the Agreement covered all of Juli's intellectual property, including the trademarked phrase "Angry Birds."

26  [116] Shapiro Decl., Ex.4 (Yacovino Dep. 84:7-29).

27  [117] If the Court were to determine that the definition of "including" is now ambiguous and unsettled, the extrinsic evidence needed to interpret the parties' intentions creates issues of fact for a jury.  As a result, summary judgment must be denied.  *San Diego Gas & Elec. Co. v. Canadian Hunter Mktg*., 132 F.3d 1303, 1307 (9th Cir.

28  1997) ("If we find a contract to be ambiguous, we ordinarily are hesitant to grant summary judgment because differing views of the intent of parties will raise genuine issues of material fact.") (citation omitted).

HB  HAGENS BERMAN

1    Adams' negotiator, Todd Ripley.[118]  Three of these four witnesses have plainly stated that Hartz'

2    present interpretation of the Agreement is wrong, and the fourth (Hartz' own former counsel)

3    had a very limited recollection of this particular Agreement, and could only testify as to his

4    general practice, and present interpretation of the contract.[119]

5            Juli Adams' testimony could not be clearer.  Juli was willing to take a low royalty for an

6    initial term to prove her worth, and then require Hartz to reopen negotiations at the end of the

7    initial term, once her value had been established.[120]  Juli intended to retain all ownership of

8    everything she provided to Hartz, including the designs and associated intellectual property,

9    including the name of the cat toys, "Angry Birds."[121]

10           Todd Ripley's testimony is squarely in accord.  Ripley gave clear instructions of his

11   intent to Marx:  he told Marx that Juli would never agree that Hartz would own Juli's intellectual

12   property.[122]  He instructed Marx that "if Hartz wanted to use anything that Juli provided Hartz

13   after the expiration of the five year term, Harts was going to have to renegotiate at the end of the

14   five-year term to pay for it."[123]  It is undisputed that Juli provided all of the property associated

15   with Angry Birds to Hartz, including the phrase itself.[124]  Ripley intended that the Agreement

16   covered everything Juli provided to Hartz.[125]  Ripley did not intend or understand that the license

17   was in any way limited to only the drawings that were attached to it.[126]  Ripley intended and

18   understood that the language in the Agreement made the license as broad as possible and

19   inclusive of "the entire Angry Birds concept, including its name, appearance, and finished

20   design."[127]  Moreover, while Marx admits he does not remember the particulars of the

21

22

23   [118] Plaintiff disclosed Todd Ripley in their Initial Disclosures as a person with knowledge.  *See* Shapiro Decl.,
     Ex. 46.  Ripley handled the negotiations with Hartz on Adams' behalf.  For its own, presumably strategic reasons,
     Hartz elected *not* to take Ripley's deposition during discovery.

24   [119] Shapiro Decl., Ex. 9 (Marx Dep. 44:1-4).
     [120] *Id*., Ex. 2 (Ripley Decl., ¶ 8).

25   [121] *Id.*
     [122] *Id.*, Ex. 2 (Ripley Decl., ¶ 11).

26   [123] *Id.*
     [124] *Id.*, Ex. 4 (Yacovino Dep. 193:17-18, 67:9-10, 185:10-14); Ex. 2 (Ripley Decl., ¶ 5); Ex. 3 (Ford Dep.

27   465:12-17).
     [125] *Id.*, Ex. 2 (Ripley Decl., ¶¶ 16-17).

28   [126] *See id.*
     [127] *Id.*, Ex. 2 (Ripley Decl., ¶18).

HB  HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   negotiation with Ripley,[128] Ripley does remember.  Specifically, Ripley remembers a phone call

2   with Marx in which he told Marx "if Hartz wanted to use 'any of it' after the five year term,

3   Hartz was going to have to pay for it.  When I said 'any of it,' I meant any of Juli's intellectual

4   property, which included the name of her toys, the Angry Birds.  Marx said 'we get it.'"[129]

5           Tim Ford, the "client" calling the shots at Hartz, testified in line with Juli and Ripley.  As

6   to Hartz' intent he said:

7               We agreed Juli retained th[e] rights to any trademarks, brands, looks, logos,
                background, anything to do with [her] art.  And [Hartz] did that so that [it] [did
8               not] have to pay [her] anything up front.  Do all this stuff for [Hartz].  We
                don't want to pay you.  We'll only pay you a 2 1/2 percent royalty which was
9               probably the smallest royalty Hartz had.[130]

10          Ignoring all this, Hartz asks this Court to accept the testimony of one witness – its former

11  general counsel, Max Marx – as gospel.  Remarkably, Marx remembered almost nothing about

12  the license negotiation:  whether the Angry Birds were prototyped at the time of the

13  negotiation;[131] if Tim Ford participated in the negotiation;[132] or why Adams was willing to

14  reduce the royalty.[133]  The most he could recall about negotiation was "a little bit."[134]

15  Importantly, and contrary to Hartz' claim otherwise, his testimony was that he *could not recall*

16  whether the negotiation of the Agreement included a discussion about the Angry Birds

17  trademark.[135]  *See* Def Brf. at 11 ("the term 'Angry Birds' was never mentioned to him by the

18  parties…").  In fact, he believed he *may have had* such discussions, but just could not

19  remember.[136]

20          Amazingly, with his faded memory, Marx claimed that the only thing that Hartz licensed

21  from Juli was the artwork attached at Appendix B.[137]  But, he based his claim not on specific

22

---

23      [128] *Id.*, Ex. 9 (Marx Dep. 102:9-10).
        [129] *Id.*, Ex. 2 (Ripley Decl., ¶15).
24      [130] *Id.*, Ex. 3 (Ford Dep. 231:15-232:3).
        [131] *Id.*, Ex. 9 (Marx Dep. 56:19-57:8).
25      [132] *Id.*, Ex. 9 (Marx Dep. 44:24-45:7) ("I don't recall specifically whether it was Mr. Ford or someone in his
        department.").
26      [133] *Id.*, Ex. 9 (Marx Dep. 102:5-18).
        [134] *Id.*, Ex. 9 (Marx Dep. 36:7).
27      [135] *Id.*, Ex. 9 (Marx Dep. 225:9-14).
        [136] *Id.*, Ex. 9 (Marx Dep. 225:15-25).
28      [137] Marx is in a precarious situation.  As former general counsel, if Hartz is found liable to Juli, and Hartz
        believes Marx erred in drafting the Licensing Agreement, he could face a possible legal malpractice claim.

PLAINTIFF'S OPP. TO MOT. FOR SUMM. JUDGMENT - 16
Case No. 14-cv-01174-RSL
005029-11 824808 V1

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1   recollection, but on his general practice and a review of the Agreement with Hartz' counsel prior

2   to his deposition.[138]  This testimony is directly rebutted by Juli Adams and Todd Ripley, and

3   even by his own "client," Tim Ford.  This disputed self-serving testimony cannot serve as the

4   basis of summary judgment.  *Carradale Import Co. v. Pusser's, Ltd.*, 1991 U.S. App. LEXIS

5   7529, at *8 (9th Cir. Apr. 12, 1991) ("The court may not interpret a contract on a motion for

6   summary judgment if the interpretation turns on the credibility of extrinsic evidence as

7   credibility issues necessarily raise triable issues of fact.").

8       Moreover at the time the Agreement was signed, Juli had already developed the Angry

9   Birds toys, their name, and their packaging.  It is implausible that the term "including" somehow

10  limited the Agreement's definition of Intellectual Property to *exclude* Adams' "Angry Birds" and

11  the associated trademark.  And, importantly, the definition of "Licensed Products" in the

12  Agreement references "the products set forth on Exhibit A attached hereto and made an integral

13  part hereof," but Hartz never attached anything as Exhibit A.  Todd Ripley, however, attests that

14  Juli's Angry Birds *were among* the "Licensed Products."[139]  Logic dictates that the Agreement

15  contemplated all of the work Juli had done for Hartz, including the Angry Birds, consistent with

16  the testimony of the only witness who claims to recall that part of the negotiation.

17  **D.   Hartz Misrepresents the Facts to Support its Arguments**

18      Hartz plays fast and loose with the facts in a strained bid to avoid trial.  First, Hartz

19  claims that "on May 22, 2007, Plaintiff signed Amendment One … thereafter Hartz filed

20  trademark applications in its own name and without any objection from Ms. Adams."  Def. Brf.

21  at 12.  Not true.  Hartz simultaneously filed the trademark applications for "The Juli Adams

22  Collection"[140] and "Angry Birds" *on March 28, 2007*, long before Amendment One was signed

23  and after Hartz consulted her on certain "trademark issues."[141]  Moreover, Amendment One

24  granted Hartz *no greater rights* that what was already provided in the Agreement under Article

---

[138] Shapiro Decl., Ex. 9 (Marx Dep. 42:11-18, 44:2-14).

[139] *Id.*, Ex. 9 (Ripley Decl., ¶ 18).

[140] *Id.*, Ex. 20 (HARTZ050002-08).

[141] While Plaintiff maintains that Amendment One was simply redundant of the rights granted in the Licensing Agreement, Hartz did not provide Adams with any additional consideration for signing Amendment One and, therefore, even if it did convey some greater rights, it is unenforceable as a matter of law.

HB HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  Eight, which made clear that although Hartz could file for trademarks, there was to be "no

2  transfer of ownership [of] … any intellectual property."

3        Hartz also claims that there are no emails or documents to support Juli's claims.  Def.

4  Brf. at 12.  In fact, there is substantial testimony supporting all of Juli's claims, including

5  testimony from Hartz' former employees that the Angry Birds were Juli's "vision" and that she,

6  alone, coined the phrase "Angry Birds."[142]  As for any missing emails and documents, Hartz

7  *does not have any formal document retention policy*,[143] and did not maintain any back-up tapes

8  prior to 2009.[144]  As Hartz' counsel admitted during discovery "since both Tim Ford and Max

9  Marx left the company prior to 2009, their emails will not be found on the annual backup

10  tapes."[145]  Hartz cannot now protest a lack of documentary evidence caused by its own dubious

11  practice of irreversibly deleting all records immediately upon an employee's separation from the

12  company.

13        Lastly, Hartz contorts the testimony of Scott Yacovino to make the unremarkable point

14  that he thought that Hartz owned the trademark and no one ever told him otherwise.  Def. Brf. at

15  11.  But, Yacovino's testimony was clear:  he was not "involved in the creation of the

16  [Hartz/Adams licensing] deal from a legal standpoint" and at the time of his deposition in August

17  2015 had he *never* even seen the Agreement.[146]  Yacovino's testimony lacks foundation and his

18  beliefs about the trademark are simply irrelevant.  *Peppers v. U.S. Cent. Credit Union*, 199 F.

19  Supp. 2d 1152, 1161-62 (D. Kan. 2002) (refusing to consider testimony at summary judgment

20  that lacks the requisite foundation).

21        Hartz' cannot make a cogent argument that its version of the Agreement is undisputed.

22  Its gamesmanship with the evidence cannot serve as the basis for summary judgment.

23  **E.    Juli Did Not Abandon Her Trademark of Angry Birds.**

24        Hartz claims Juli abandoned the trademark because she did not make use of it for three

25  consecutive years between December 31, 2010, and August 4, 2014.  Def. Brf. at 15.  Hartz is

---

26  [142] *Id.*, Ex. 4 (Yacovino Dep. 193:17-18, 67:9-10, 185:10-14).
27  [143] *Id.*, Ex. 43 (Fornshell Dep. 29:3-20, 38:11-20).
   [144] *Id.*, Ex. 45 (Feb. 10, 2015 Email From T. Marciano to P. Howard).
28  [145] *Id.*
   [146] *Id.*, Ex. 4 (Yacovino Dep. 15:3, 69:20-2).



1    wrong on the law and on the facts.  It is wrong on the law because the doctrine of licensee

2    estoppel precludes Hartz from even raising the defense of abandonment.  *See STX, Inc. v. Bauer*

3    *USA*, 1997 U.S. Dist. LEXIS 16250, at *30-31 (N.D. Cal. June 5, 1997) ("licensees are estopped

4    from challenging the validity of a mark"); *see also id.* ("former licensees may not challenge the

5    licensor's mark based upon facts which arose during the term of the license") (citations omitted);

6    *Gorenstein Enters, Inc. v. Quality Care-USA, Inc.*, 874 F.2d 431, 435 (7th Cir. 1989) (a

7    licensee's use of a mark inures to the benefit of the licensor, and the licensee acquires no

8    ownership rights in the mark itself); *see also* Thomas McCarthy, *McCarthy on Trademarks and*

9    *Unfair Competition* § 18.20 at 18-97 ("licensee acquires no title to the mark").  According to the

10   contemporaneous writings of its own employees, Hartz commenced selling Juli's Angry Birds in

11   January 2008, which triggered the Agreement's five-year term, expiring in January 2013.  After

12   Hartz discontinued the sale of Juli's Angry Birds in December 2010 – a fact never conveyed to

13   Juli – the Agreement remained in effect.  The Agreement is clear that there was no transfer of

14   ownership of any of the intellectual property; and it was Hartz' key responsibility (not Juli's) "to

15   protect any filings for the Intellectual Property."  Hartz hid its decision to stop selling Juli's

16   Angry Birds and breached its express responsibilities under the Agreement.  It is now estopped

17   from arguing that Juli abandoned her rights during the pendency of the Agreement.

18       Hartz is also wrong on the facts.  It was *only one year* after the Agreement's expiration –

19   January 23, 2014 – that Juli had counsel contact Hartz to assert her claim of "ownership of the

20   intellectual property rights associated with what is known as the 'Angry Birds.'"[147]  Juli never

21   abandoned the trademark and Hartz cannot satisfy its stringent burden of proof otherwise.

22   *Partners for Health & Home, L.P. v. Seung Wee Yang*, 2010 U.S. Dist. LEXIS 143476, at *7

23   (C.D. Cal. Sept. 13, 2010) ("The burden of proof is on the party seeking to show abandonment,

24   which must be shown by clear and convincing evidence.").

25   **F.    Juli Did Not Grant Hartz a Naked License**

26       Hartz claims that Juli granted it a "naked license" for the Angry Birds' trademark because

27   (1) the Agreement did not contain language regarding oversight of product quality; and (2)

28   

---

[147] *Id.*, Ex. 41 (Jan. 23, 2014 J. Hanamirian, Esq. Ltr. to Hartz).



1   (according to Hartz') Juli never exercised quality control.  Def. Brf. 16-17.  But the facts tell a

2   different story.  As the Court recognized, there is no control requirement when a trademark

3   owner consents to another party's defined usage of the trademark.  *Adams*, 2014 U.S. Dist.

4   LEXIS 173026, at *11 (*citing Miller v. Glenn Miller Prods.*, 454 F.3d 975, 992 (9th Cir. 2006)).

5   The purpose of the control requirement is the protection of the public.  The principal being that if

6   a licensor fails to maintain control of her licensees in their use of the license, the public may be

7   damaged by products that, despite their trademark, do not have the normal quality of such goods.

8   *Edwin K. Williams & Co., Inc. v. Edwin K. Williams & Co.-East*, 542 F.2d 1053, 1059 (9th Cir.

9   1976).  The amount of control varies depending on the circumstances.  *Id*.; *Sheila's Shine Prods.,*

10  *Inc. v. Sheila Shine, Inc*., 486 F.2d 114, 125 (5th Cir. 1973) (three or four years lapse in exercise

11  of control not enough to work abandonment).  The lack of an express contract right to inspect

12  and supervise a licensee's operations is not conclusive evidence of lack of control.  *Barcamerica*

13  *Int'l USA Trust v. Tyfield Imps., Inc.*, 289 F.3d 589, 596 (9th Cir. Cal. 2002).  "There need not be

14  formal quality control where the particular circumstances of the licensing arrangement [indicate]

15  that the public will not be deceived."  *Id*. (citations omitted).  And, "a finding of insufficient

16  control essentially works a forfeiture, a person who asserts insufficient control must meet a high

17  burden of proof."  *Edwin K. Williams & Co.*, 542 F.2d at 1059 (citation omitted).

18      The evidence demonstrates that Juli maintained sufficient control over her work and the

19  law *does not require* that she micromanage Hartz from day to day.  *John C. Flood of Va., Inc. v.*

20  *John C. Flood, Inc.*, 700 F. Supp. 2d 90, 96 (D.D.C. 2010) ("The licensor … need not

21  micromanage the licensee.  To the contrary, retention of a trademark requires only minimal

22  quality control.").  The undisputed facts demonstrate that after Juli designed the Angry Birds

23  toys and coined the phrase "Angry Birds" to describe and sell them, Hartz flew Juli to its

24  headquarters to work with the prototypes.  Juli had "lot[s] of design changes" to the

25  prototypes.[148]  After Juli finished her design changes, "the Angry Birds did not evolve all that

26

27

28

---

[148] *Id*., Ex. 1 (Adams Dep. 65:5-21, 152:19-153:2) ("I made notations on the overall look of the toy, what I thought needed to be changed, and then they would send them back and redo them….  And then they would show me again.  And then I would give approval….").



much" with the exception of "minor tweaks."[149]  And only Juli created the background stories ("the copy") for each character, which appeared on the back of the packaging.  In fact, Hartz maintained contact with Juli and would call on her when they needed her "dig into something."[150]

Without detail, and in support of its request that the Court find Juli forfeited all her rights, Hartz claims it made design changes to the Angry Birds in response to a retailer's complaint, without Juli's consent.  Def. Brf. at 18.  In reality, the testimony was that Hartz made *no* "broadscale changes to th[e] [Angry Birds] line of toys" and that if any changes were made they would have "probably [been] minimal[]."[151]  Hartz also ignores that when it encountered trademark difficulties with the marks for some of the individual characters within the Angry Birds line, it specifically *asked Juli* to re-name them.[152]  Hartz continued to request Juli design new and different Angry Birds, which they would prototype and send to her for review.[153]  The evidence demonstrates Juli maintained sufficient supervision and control over her intellectual property such that Hartz' naked license argument fails.

## G.   Juli May Pursue Her Unjust Enrichment Claim

Hartz claims that because the Agreement governs the parties' relationship, Juli's claim for unjust enrichment fails as a matter of law.  Def. Brf. at 19.  Hartz is wrong.  *First*, under Washington law, "the mere existence of a contract between the parties does not preclude an unjust enrichment claim…."  *Hyytinen v. City of Bremerton*, 2014 Wash. App. LEXIS 3053, at *15 (Wash. Ct. App. Dec. 30, 2014).  A claim for unjust enrichment lies when "one retains money or benefits which in justice and equity belong to another."  *Young v. Young*, 191 P.3d 1258, 1262 (Wash. 2008) (citation omitted).  Here, the Agreement set a royalty payment to Juli

---

[149] *Id.*, Ex. 4 (Yacovino Dep. 199-200).
[150] *Id.*, Ex. 4 (Yacovino Dep. 180:12-15, 179:8-9).
[151] *Id.*, Ex. 4 (Yacovino Dep. 106:1-11).
[152] *Id.*, Ex. 18 (HARTZ018374).
[153] *Id.*, Ex. 44 (HARTZ018379) (Yacovino writing to Juli on October 11, 2007, "Juli, I think it would be a good idea to sketch up a few more additions to the [Angry Birds] line.  Is this something you are in a position to tackle?  Scott Yacovino."); Ex. 4 (Yacovinio Dep. 177:7-10) ("[D]o you recall whether or not any of these were made into samples?  Yeah, I believe they were.").

HAGENS BERMAN
1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

based on the sale of the "Licensed Products."[154]  The Agreement also set forth the parties

obligations, defined the term (five years), and made clear that Juli was not transferring ownership

of her intellectual property to Hartz.  When Hartz improperly leveraged Juli's intellectual

property – the Angry Birds trademark – to obtain an exclusive license deal with Rovio that it

would *not* otherwise have secured, it was unjustly enriched by an amount *not* defined by the

Agreement, *i.e.*, the sales of the Rovio Angry Birds.  The Agreement does not contemplate

Hartz' abuse of Juli's intellectual property and fails to provide an adequate remedy to Juli based

on Hartz' unanticipated conduct.  Therefore, justice and equity require that Juli obtain the

benefits Hartz improperly received.[155]

     *Second*, and even if the Agreement provided an adequate remedy (which it does not), Juli

would still be free to pursue both claim at trial, and is – at best – only prohibited from *recovering*

*under both*.  *Menalco v. Buchan*, 2010 U.S. Dist. LEXIS 8042, at *93 (D. Nev. Feb. 1, 2010)

(plaintiff "may pursue [unjust enrichment] in the alternative to their breach of contract claim,

however, they may not recover on both theories").  And, *lastly*, at a minimum, Juli's unjust

enrichment claim is appropriate for Hartz' sale of the Rovio-themed Angry Birds after the

Agreement expired.  *National Serv. Ass'n v. Capitol Bankers Life Ins. Co.*, 832 F. Supp. 227, 233

(N.D. Ill. 1993) (recognizing unjust enrichment claim proper for period after contract expired).[156]

## H.     Hartz Deliberately Infringed Juli's Angry Birds Trademark

     Juli is entitled to recover Hartz' profits for the sale of the Rovio-themed Angry Birds.

"[P]rofits must be granted in light of equitable considerations" and Hartz "may not retain the

fruits … of unauthorized trademark use."  *Fifty-Six Hope Rd. Music, Ltd. v. A.V.E.L.A., Inc.*, 778

F.3d 1059, 1073 (9th Cir. 2015) (internal quotations and citations omitted).  Hartz willfully and

deliberately infringed Juli's intellectual property when it leveraged the Angry Birds trademark to

---

[154] *Id.*, Ex. 15 (Dkt. No. 1, Ex. A, § 4.1 ("Royalties … Hartz agrees to pay to Juli Adams … the Running Royalties based on the Net Sales of the Licensed Products." ).

[155] The outcome is the same under New Jersey law because a claim for unjust enrichment lies where a party is enriched "beyond its contractual rights." *VRG Corp. v. GKN Realty Corp.*, 641 A.2d 519, 526 (N.J. 1994) ("[t]he unjust enrichment doctrine requires that plaintiff show that it expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights"); *see also Royale Luau Resort, LLC v. Kennedy Funding, Inc.*, 2008 U.S. Dist. LEXIS 11902, at *30 (D.N.J. Feb. 19, 2008).

[156] *See also United States Jaycees v. Philadelphia Jaycees*, 639 F.2d 134, 143 (3d Cir. 1981) (termination of a trademark license precludes any further use of the trademark by the licensee).



1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594

1  get an exclusive license agreement from Rovio.  *Maier Brewing Corp., v. Fleischmann Distilling*

2  *Co.*, 390 F.2d 117, 123 (9th Cir. 1968) ("the purposes of the Lanham Act can be accomplished

3  by making acts of deliberate trade-mark infringement unprofitable.").

4         Hartz' internal documents show that only weeks after sending Juli her final royalty check

5  in February 2011, and without advising her, it set out to "[d]etermine how to properly leverage

6  [its] current ® on Angry Birds in all pet products."[157]  And, as Rovio's licensing agent made

7  clear, Rovio had rejected similar pet toy proposals; would not have done a deal with Hartz absent

8  the trademark; and Hartz put them "over a barrel," leading them to relent.[158]  Indeed, Hartz

9  threatened Rovio that if they did not reach an agreement, it would "pursue ***our version of the***

10  ***Angry Birds*** for the 2011 holiday season and beyond," causing confusion in the marketplace.[159]

11         Hartz' willful and unauthorized use of Juli's mark in commerce on the Rovio-themed

12  toys creates the presumption of confusion that Hartz was the owner of the mark.  *Travelodge*

13  *Hotels, Inc. v. Elkins Motel Assocs.*, 2005 U.S. Dist. LEXIS 24534, at *25 (D.N.J. Oct. 17, 2005)

14  ("there is a great likelihood of confusion when a party uses the exact same trademark as the

15  Plaintiff…").  Hartz' own former employee believed that the Rovio game may be associated with

16  Juli's Angry Birds.  Scott Yacovino testified that *after* he left the employ of Hartz in 2010 and

17  became aware of Rovio's video game, he thought they were "pretty similar" to Juli's; "close in

18  terms of color palette;" they "weren't that far away from Juli's designs" and had "a similar

19  concept … Juli's birds were angry, the cats chasing them, and this was the same concept [from

20  Rovio]."[160]  Hartz' request for summary judgment on the measure of damages must be denied.

21  **I.     Hartz Ignores the Law on Trademark Damages**

22         Hartz argues that Juli's expert, Drew Voth, failed to perform the proper analysis in

23  calculating her damages as the profits Hartz earned on the Rovio-themed toys.  Def. Brf. 22-23.

24  Hartz claims that Mr. Voth was required to limit his damages to only those "attributable to the

25  infringement."  *Id.*  Hartz, again, misstates the law and evidence.

26

---

[157] Shapiro Decl., Ex. 30 (HARTZ000923).
[158] *Id.*, Ex. 32 (Mostman Dep. 19:20-20:13, 42:17-43:16).
[159] *Id.*, Ex. 34 (HARTZ002575).
[160] *Id.*, Ex. 4 (Yacovino Dep. 206-207).



In citing the Ninth Circuit Jury Instructions, Hartz ignores that the jury is to be instructed that "[u]nless you find that a portion of the profit from the sale of the [specify goods] using the trademark is attributable to factors *other than use of the trademark*, you shall find that the total profit is attributable to the infringement."  Model Civ. Jury Instr. Ninth Cir. 15.26.  Indeed in rejecting the apportionment of profits in trademark litigation, the Supreme Court has held that the "owner of the trade-mark is entitled to so much of the profit as resulted from the use of the trade-mark."  *Hamilton-Brown Shoes Co. v. Wolf Bros. & Co.*, 240 U.S. 251, 262 (1916).  As Rovio's licensing agent made clear, Hartz would not have gotten the Rovio Agreement ***at all*** absent the leverage it asserted by improperly exploiting Juli's trademark.  And, "it is more consonant with reason and justice that the owner of the trade-mark should have the whole profit than that [she] should be deprived of any part of it by the fraudulent act of the defendant."  *Id*.

Moreover, under federal trademark law, it is Hartz, not Juli, that "has to establish expenses and the portion of the profit attributable to factors other than use of the infringed trademark by a preponderance of the evidence."  *Competition Specialties Inc., v. Competition Specialties, Inc.*, 87 Fed. App'x 38, 43 (9th Cir. 2004).  And Mr. Voth's report is clear:  "Hartz [did] not produce[] documents showing its fixed costs."[161]  So, Mr. Voth deducted all the costs that were made available to him, including "delivery costs (which include the product costs), freight, and royalties to Rovio in order to calculate Hartz' relevant profits."[162]  Hartz cannot now use its own failure to produce documents as a basis to limit Juli's damages.  It was Hartz' burden to do so and any argument regarding these unknown and unverified costs should be precluded.

## IV.   CONCLUSION

Hartz has failed to meet its burden for summary judgment and its Motion should be denied, in its entirety.  Juli Adams has established that her claims, and each of them, are supported by sufficient evidence that it should be up to a jury to decide whether Hartz breached its contract, was unjustly enriched, and usurped Juli's intellectual property rights and ownership of the Angry Birds trademark.

---

[161] *Id.*, Ex. 48 (Voth Report, ¶ 24) (subject to motion to seal).
[162] *Id.*, Ex. 48 (Voth Report, ¶ 22) (subject to motion to seal).

DATED: October 26, 2015

**HAGENS BERMAN SOBOL SHAPIRO LLP**

By:   */s/Anthony D. Shapiro*
    Anthony D. Shapiro #12824
Thomas E. Loeser #38701
**HAGENS BERMAN SOBOL SHAPIRO LLP**
1918 Eighth Avenue, Suite 3300
Seattle, WA 98101
Tel: (206) 623-7292
tony@hbsslaw.com
toml@hbsslaw.com

Simon B. Paris
Patrick Howard
**SALTZ, MONGELUZZI, BARRETT &**
**BENDESKY, P.C.**
One Liberty Place, 52nd Floor
1650 Market Street
Philadelphia, PA 19103
Tel: (215) 575-3985
sparis@smbb.com
phoward@smbb.com

Daniel E. Gustafson
**GUSTAFSON GLUEK PLLC**
120 South Sixth Street #2600
Minneapolis, MN 55402
Tel: (612) 333-8844
dgustafson@gustafsongluek.com

*Attorneys for Plaintiff Juli Adams*



1

## **CERTIFICATE OF SERVICE**

2        I hereby certify that on October 26, 2015, I electronically filed the foregoing document

3  using the CM/ECF system which will send notification of such filing to the e-mail addresses

4  registered in the CM/ECF system, as denoted on the Electronic Mail Notice List.

5                                                  */s/ Anthony D. Shapiro*

6                                                  Anthony D. Shapiro

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

PLAINTIFF'S OPP. TO MOT. FOR SUMM. JUDGMENT - 26
Case No. 14-cv-01174-RSL
005029-11 824808 V1

HAGENS BERMAN

1918 EIGHTH AVENUE, SUITE 3300 • SEATTLE, WA 98101
(206) 623-7292 • FAX (206) 623-0594